## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Joint Administration Pending) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION DEBT, (B) GRANTING SUPER-PRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) SCHEDULING A FINAL HEARING, AND (D) GRANTING RELATED RELIEF

Desolation Holdings LLC and its affiliated debtors, Bittrex, Inc., Bittrex Malta Holdings Ltd., and Bittrex Malta Ltd., as debtors and debtors in possession (collectively, the "Debtors," and, together with their non-debtor affiliates, "Bittrex"), by and through their proposed undersigned counsel, hereby submit this motion (this "Motion") for entry of an interim order ("Interim Order")[2] substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order" and collectively with the Interim Order, the "Orders"), pursuant to sections 105(a), 363, and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Rules"): (a) authorizing the Debtors to incur post-petition

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764).  The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

debt, (b) granting super-priority administrative expense claims in favor of the DIP Lender (as defined below), (c) scheduling a final hearing, and (d) granting related relief.

## SUMMARY AND EMERGENCY BASIS

1.      The Debtors seek authorization to enter into post-petition financing pursuant to 11 USC § 364(c).  Without the financing, the Debtors will suffer immediate and irreparable harm because they would be required to cease their orderly wind down operations.  Upon approval of this Motion, Aquila Holdings Inc. (or its designee), the proposed post-petition lender (the "DIP Lender"), will provide DIP financing, and in accordance with the DIP Loan Agreement attached as **Exhibit B** (the "DIP Loan Agreement" and together with any documentation evidencing the DIP Loan agreed to by the Debtor and DIP Lender (in their respective sole discretion), the "DIP Loan Documents")), up to 700 bitcoin ("BTC")), of which 250 BTC would be available upon entry of the Interim Order, to be used for the payment of wind down and working capital expenses, other general corporate purposes, and any other amounts set forth in the proposed budget attached as **Exhibit 1** to Exhibit A (the "Budget").  In exchange, the DIP Lender will be given super-priority administrative expense claims in the Chapter 11 Cases (as defined below) pursuant to section 364(c)(1).

## OVERVIEW

2.      The Debtors commenced the Chapter 11 Cases in order to protect their customer base in the context of the orderly wind down of Bittrex's U.S. and Malta operations.  However, the Debtors need financing in order to facilitate the Debtors' orderly wind down.

3.      By this Motion, the Debtors seek authority to consummate a DIP Loan (as defined below) with the DIP Lender on the terms set forth in the DIP Loan Agreement, consisting of new delayed draw loans in an amount up to 700 BTC.  The proceeds of the DIP Loan will be used to pay (a) wind down and working capital expenses of the Debtors, (b) other general corporate

purposes, (c) costs and expenses incurred in administering these cases, and (d) interest and fees (including professional fees and expenses) due under the DIP Loan Documents.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      The statutory predicates for the relief sought herein are sections 105(a), 363, and 364 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") for procedural purposes only.  The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

7.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the

*Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of the Chapter 11 Petition and First Day Motions* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.[3]

## RELEVANT FACTUAL BACKGROUND

### A.    The Debtors' Wind Down

8.    As described in more detail in the First Day Declaration, the Debtors commenced these Chapter 11 Cases for the purpose of allowing customer withdrawals, consistent with Bittrex's terms of service and applicable law, within an orderly wind down of Bittrex's U.S. and Malta operations.  Through these Chapter 11 Cases, the Debtors seek to complete the previously announced wind down of its U.S. business and implement the wind down of its Malta business, and accomplish, as soon as practicable, a comprehensive process that will (a) maximize value for the Debtors' creditors and stakeholders; (b) maintain intact Bittrex's non-U.S. business operations (other than its Malta business) for the benefit of non-U.S. customers; and (c) fairly separate the non-U.S. operations.  Concurrent with the filing of this Motion, the Debtors have filed their proposed chapter 11 plan, which provides, among other things, that the Debtors' customers entitled to distributions will receive under the plan a 100 percent like-kind cryptocurrency distribution. This means that with respect to customers, they will be entitled to access the Bittrex platform and withdraw cryptocurrencies consistent with the plan and with their allowed claims.  The Debtors do not intend to monetize cryptocurrencies reserved for like-kind distributions to holders of allowed customer claims, and any change in the value of such assets following the Petition Date would be borne by the Debtors' customers.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

B.      **Background to Proposed DIP Loan**

9.      Prior to the Petition Date, the Debtors recognized a need for further financing and began the process of considering potential funding sources.

10.     Subject to Court approval pursuant to 11 U.S.C. § 364(c), the DIP Lender agreed to provide financing to the Debtors in an amount up to 700 BTC (the "DIP Loan") (subject to any limitations on borrowing under the DIP Loan Documents).[4]   The DIP Loan Documents are contingent upon the DIP Loan being allowed as a super-priority claim pursuant to 11 U.S.C. § 364(c)(1), with priority over any and all administrative expenses of any kind or nature, subject only to the Carve-Out.

11.     The DIP Loan will be used to fund the Debtors' wind down operations during the Chapter 11 cases.  If the DIP Loan is not approved, the Debtors will be forced to cease their wind down operations.

12.     The Debtors have no other unsecured credit available to them.  The Debtors have therefore exercised their sound business judgment in deciding to enter into the DIP Loan in order to ensure that wind down operations are funded.

13.     The DIP Lender is the parent company of the Debtors and is familiar with their operations.  The DIP Lender is willing to provide funding on terms that are more favorable than the Debtors have available to them from any other source, including the DIP Loan being provided on an unsecured basis.  The DIP Loan was negotiated in good faith and at arm's length.  The Debtors were represented by separate, independent representatives and advisors in the negotiation of the DIP Loan.  In particular, Tim Pohl, the independent director of Debtor Bittrex, Inc., negotiated, on behalf of the Debtors, the business terms of the DIP Loan, with representatives of

---

[4]    The repayment of the principal amount of the DIP Loan will be in BTC.

the DIP Lender.  Mr. Pohl was advised in these negotiations by the Debtors' separate legal counsel and assisted by the Debtors' Co-Chief Restructuring Officer, Evan Hengel.

**C.**     **DIP Loan Will be Made in BTC and Repaid in BTC**

14.     Notably, the DIP Loan will be made in BTC and the principal amount will be repaid in BTC.  Although novel to those outside of the cryptocurrency industry, borrowing funds in BTC is not uncommon for participants in the cryptocurrency industry, as BTC is that industry's currency of choice.  Following the closure of the Debtors' U.S. dollar fiat banking services provider, Silvergate Bank, access to fiat currency for a cryptocurrency company in wind-down mode is unlikely.  While the Debtors discussed with the DIP Lender whether it would make the DIP Loan in U.S. dollars, the DIP Lender was unwilling to do so due to potential negative tax consequences to the DIP Lender, which would have greatly increased the expense of lending and for which the Debtors would have been charged.

15.     In order to prevent negative tax consequences, the DIP Lender also requires the principal amount of the DIP Loan to be repaid in BTC.  Importantly, the Debtors negotiated protection against the risk of currency rate fluctuations between the time the DIP Loan is borrowed and repaid, as further discussed below.  It is expected that the DIP Loan will be made in two draws – 250 BTC upon approval of the Interim Order and an additional 450 BTC upon approval of the Final Order.  Following each of these draws, the Debtors intend to convert promptly the BTC into U.S. dollars in order to minimize any risks of currency rate fluctuation.  After converting BTC from the DIP Loan into U.S. dollars, the Debtors will use those proceeds to pay their administrative expenses in the Chapter 11 Cases in accordance with the Budget, including professional fees and employee costs, among other things.

16.     When the Debtors repay the DIP Loan at maturity, the Debtors will be required to repay the principal amount in BTC.  All other obligations under the DIP Loan will be repaid, at the Debtors' option, in BTC, U.S. dollars, or any combination thereof.  If the Debtors do not have sufficient BTC on hand to repay at maturity the full principal amount of the DIP Loan in BTC and there is a shortfall, the Debtors will have to use the currencies they possess at that time of repayment to acquire the additional BTC to pay that shortfall.  Significantly, to protect against currency rate fluctuations between the time of borrowing the DIP Loan and repaying it, the Debtors negotiated a cap on the amount of additional BTC they may need to acquire in order to pay the shortfall.  Specifically, the amount of BTC the Debtors may need to acquire to pay the shortfall is capped at a number of BTC equal to 110% of the value of the shortfall on the Petition Date.

**D.      Debtors Seek to Move Forward with DIP Loan**

17.     The Debtors anticipate confirmation of a plan prior to the maturity of the DIP Loan. The DIP Loan presents these estates with the best economic terms available and provides the Debtors with adequate liquidity for an orderly wind down of their U.S. and Malta operations and to satisfy ongoing administrative expenses associated with the Chapter 11 Cases.

18.     The Debtors now seek to move forward with the proposed DIP Loan on the terms set forth in the DIP Loan Documents.  Subject to this Court's approval, the Debtors intend to draw on the DIP Loan in order to satisfy the Debtors' expenses in this wind down process.

## CONCISE STATEMENT OF RELIEF REQUESTED

19.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2, the below table summarizes[5] the terms of the proposed financing:

---

[5]     The summaries and descriptions of the terms and conditions for the proposed financing and the provisions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the proposed Interim Order and the DIP Loan Documents.  In the event there is any conflict

| Term | Summary | Source |
|------|---------|--------|
| **BORROWERS**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Debtors | DIP Loan Agreement Preamble |
| **DIP LENDER**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Aquila Holdings Inc. (or its designee) | DIP Loan Agreement Preamble |
| **DIP LOAN/**<br>**USE OF PROCEEDS**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Up to 700 BTC super-priority debtor-in-possession financing facility, consisting of a delayed draw term loan facility to be used for general wind down, working capital, and liquidity purposes.  For purposes of the Interim Order, the Debtors' borrowing authority under the DIP Loan shall be capped at the Interim Amount Limit of 250 BTC.<br><br>There is no roll-up of pre-petition debt contemplated under the DIP Loan. | DIP Loan Agreement, §§ 1.1, 2.1, 2.4<br><br>Interim Order, ¶ 1 |
| **BUDGET**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii), 4001(c)(1)(B) | The "Budget" shall mean the weekly cash flow budget in the form attached as Exhibit 1 to the Interim Order (including any updates thereto approved by the DIP Lender).  Any changes or updates to the Budget shall be subject to approval of the DIP Lender, in its sole discretion. | Exhibit 1 to the Interim Order |
| **MATURITY DATE**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The "Maturity Date" means the date which is nine (9) months from the Closing Date. | DIP Loan Agreement, § 1.1 |
| **INTEREST**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Rate: 4.00% per annum, compounding monthly. Accrued interest shall be payable on the Maturity Date or immediately upon acceleration of the DIP Loan. | DIP Loan Agreement, § 3.3 |
| **DEFAULT INTEREST**<br><br>Bankruptcy Rule 4001(c)(1)(B) | 1.00% above contract rate. | DIP Loan Agreement, § 3.4 |

---

between this Motion and the Interim Order or the DIP Loan Documents, the Interim Order and the DIP Loan Documents will control in all respects.

| | | |
|---|---|---|
| **REPAYMENT**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Repayment of the principal amount of the DIP Loan will be in BTC.  All other obligations under the DIP Loan will be repaid, at the Debtors' option, in BTC, U.S. dollars, or any combination thereof.  If the Debtors do not have sufficient BTC on hand to repay at maturity the full principal amount of the DIP Loan in BTC and there is a shortfall, the Debtors will use the currencies they possess at that time of repayment to acquire the additional BTC to pay that shortfall.  The amount of BTC the Debtors may need to acquire to pay such shortfall shall be capped at a number of BTC equal to 110% of the value of the shortfall on the Petition Date. | DIP Loan Agreement, § 3.1.4 |
| **SECURITY**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | None. | |
| **SUPER-PRIORITY**<br><br>4001(c)(1)(B)(i) | All DIP Obligations shall constitute joint and several allowed super-priority administrative expense claims against the Debtors for the DIP Obligations under the DIP Loan (the "DIP Super-priority Claims") (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code with priority in right of payment over any and all administrative expenses in the Chapter 11 Cases, in any successor case under chapter 11 of the Bankruptcy Code and in any case with respect to the Debtors converted to chapter 7 of the Bankruptcy Code, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code; *provided*, *however*, that the DIP Super-priority Claims shall be subject to the | Interim Order, ¶ 9 |

| | | |
|---|---|---|
| | Carve-Out (as defined below).  In addition to all rights of indemnity and subrogation any Debtor may have under applicable law, each Debtor agrees that in the event such Debtor is the initial obligor of an Obligation (the "Obligor Debtor"), for which a payment is made by another Debtor (the "Paying Debtor"), the Obligor Debtor shall indemnify the Paying Debtor for the full amount of such payment (in all cases after payment of the Obligations to the DIP Lender in full), and the Paying Debtor shall be subrogated to the rights of the party to whom such payment shall have been made to the extent of such payment (in all cases after payment of the Obligations to the DIP Lender in full). | |
| **CARVE-OUT**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Subject to the terms of the Orders, and notwithstanding anything in any DIP Loan Documents to the contrary, the DIP Obligations and DIP Super-priority Claims in favor of the DIP Lender shall be subject and subordinate in all respects to the payment of the Carve-Out.  As used in the Interim Order, the "Carve-Out" means, collectively, the aggregate amount needed for (i) accrued but unpaid fees, costs, and expenses of the professionals of the Debtors and the Committee incurred at any time prior to the DIP Lender's delivery of a Carve-Out Trigger Notice, up to the amounts set forth for each Professional in the Budget for such time period and only to the extent allowed by the Bankruptcy Court, (ii) professional fees, costs and expenses of the Debtors and the Committee incurred after delivery of a Carve-Out Trigger Notice not to exceed $250,000 with respect to the Professionals, to the extent allowed by the Bankruptcy Court, and (iii) the payment of fees and expenses pursuant to 28 U.S.C. § 1930; *provided*, that nothing in the Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements, or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out.  In no event shall the Carve-Out, or the funding of the DIP Loan to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations. | Interim Order, ¶ 14 |

|  | "Carve-Out Trigger Notice" means written notice by the DIP Lender to the Debtors invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default. |  |
|---|---|---|
| **CONDITIONS**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary conditions for financings of this type, as set forth in Article V of the DIP Loan Agreement. | DIP Loan Agreement, §§ 5.1, 5.2 |
| **COVENANTS:**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary affirmative and negative covenants for financings of this type, as set forth in Article VII of the DIP Loan Agreement. | DIP Loan Agreement, §§ 7.1, 7.2 |
| **EVENTS OF DEFAULT**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary events of default for financings of this type, as set forth in Article VIII of the DIP Loan Agreement. | DIP Loan Agreement, § 8.1 |
| **REMEDIES**: | Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court), by written notice to the Debtors, subject to the Orders, (a) send the Carve-Out Trigger Notice and (b) declare (i) the unpaid principal amount of and accrued interest on the Loans and (ii) all other Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become immediately due and payable, and the obligation of the DIP Lender to make any Loans, and the Commitment, shall thereupon terminate.  Upon the occurrence and during the continuance of any Event of Default, the DIP Lender shall be required to obtain the authority of this Court to exercise any rights and remedies of the DIP Lender forth in any of the Loan Documents, in addition to all rights and remedies allowed by the United States and any state thereof. | DIP Loan Agreement, § 8.2 |

| | | |
|---|---|---|
| **PREPAYMENTS**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Prior to the Maturity Date, prepayments of the DIP Loan may be made at any time without premium or penalty. | DIP Loan Agreement, § 3.1 |
| **INDEMNIFICATION**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject in all respects to the terms of the DIP Loan Documents, the Debtors shall, jointly and severally, indemnify and hold harmless the DIP Lender against any and all liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel, financial advisors and other professional and advisors) in connection with any other investigative, administrative or judicial proceedings, whether or not such indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to, arising out of, by reason of or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with the making of advances of the DIP Loan and the DIP Loan Documents, the use or intended use of the DIP Loan proceeds of the advances and the other transactions contemplated hereby or thereby or the Debtors' chapter 11 cases. | DIP Loan Agreement, §9.13 |

**DISCLOSURES**

20.     Pursuant to Local Rule 4001-2, the DIP Facility contains the following provisions:

| HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2[6] | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Local Rule 4001-2(a)(i)**<br><br>Summary of essential terms | See table *supra*. | — |
| **Local Rule 4001-2(a)(i)(A)**<br><br>Amount of credit the Debtors seek to obtain, including committed amount and amount of funding available to Debtors | See table *supra* ("DIP LOAN/ USE OF PROCEEDS") | DIP Loan Agreement, §§ 1.1, 2.1, 2.4 |
| **Local Rule 4001-2(a)(i)(B)**<br><br>Pricing and economic terms | See table *supra* ("INTEREST RATE") | DIP Loan Agreement, § 3.3 |
| **Local Rule 4001-2(a)(i)(C)**<br><br>Specific limits on Court's power or discretion to enter future orders | None. | — |
| **Local Rule 4001-2(a)(i)(D)**<br><br>Funding of non-Debtor affiliates | None. | — |
| **Local Rule 4001-2(a)(i)(E)**<br><br>Conditions to closing and borrowing, including budget provisions | See table *supra* ("CONDITIONS"; "COVENANTS"; "DIP LOAN/ USE OF PROCEEDS"; "BUDGET") | DIP Loan Agreement, §§ 5.1, 5.2,<br><br>Exhibit 1 to the Interim Order |
| **Local Rule 4001-2(a)(i)(F)**<br><br>Any carve-outs, including professional fee carve-outs | See table *supra* ("CARVE-OUT") | Interim Order, ¶ 14 |
| **Local Rule 4001-2(a)(i)(G)**<br><br>Postpetition liens on unencumbered assets | None. | — |
| **Local Rule 4001-2(a)(i)(H)**<br><br>Plan or sale milestones | None. | — |

---

[6]   This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this summary and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, shall control.

| HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2[6] | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| **Local Rule 4001-2(a)(i)(I)** Prepayment provisions | See table *supra* ("PREPAYMENTS") | DIP Loan Agreement, § 3.1 |
| **Local Rule 4001-2(a)(i)(J)** Joint liability | See table *supra* ("SUPER-PRIORITY") | DIP Credit Loan Agreement, §§ 2.5, 9.8 <br><br> Interim Order, ¶ 9 |
| **Local Rule 4001-2(a)(i)(K)** Payment of fees and expenses | Upon the Maturity Date or earlier acceleration of the DIP Loan, the Debtors shall pay to the DIP Lender promptly upon receipt of an invoice or accounting all of the DIP Lender's reasonable costs and expenses, including without limitation, due diligence, transportation, computer, duplication, appraisal, audit (including per diems), insurance, consultant, search, filing and recording fees, and all other reasonable out-of-pocket expenses incurred by the DIP Lender (including the reasonable fees and expenses of counsel, financial advisors, and other professionals and advisors) and all reasonable expenses of the Lender in connection with the negotiation, administration, monitoring, and enforcement of the DIP Loan Documents. | DIP Loan Agreement, §9.12 <br><br> Interim Order, ¶ 12 |
| **Local Rule 4001-2(a)(i)(L)** Prohibitions on use of estate funds to investigate prepetition liens and claims | None. | — |
| **Local Rule 4001-2(a)(i)(M)** Termination or default provisions | See table *supra* ("EVENTS OF DEFAULT") | DIP Loan Agreement, § 8.1 <br><br> Interim Order, ¶ 18 |
| **Local Rule 4001-2(a)(i)(N)** Cross collateralization protection or elevation of prepetition debt | None. | — |
| **Local Rule 4001-2(a)(i)(O)** "Roll up" of prepetition debt to postpetition debt | None. | — |
| **Local Rule 4001-2(a)(i)(P)** Nonconsensual priming | None. | — |
| **Local Rule 4001-2(a)(i)(Q)** | None. | — |

| HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2[6] | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| Findings of fact that bind the state to the validity, perfection, or amount of the secured creditors' prepetition lien or waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the Interim Order to investigate such matters | | |
| **Local Rule 4001-2(a)(i)(R)** Provisions immediately approving all terms and conditions of underlying loan agreement | None. | — |
| **Local Rule 4001-2(a)(i)(S)** Modification or termination of the automatic stay to permit lender to enforce remedies that do not require at least five days' written notice to Debtors, U.S. Trustee, and Committee | None. | — |
| **Local Rule 4001-2(a)(i)(T)** Limitations on arguments of parties in interest at emergency hearing during Remedies Notice Period | None. | — |
| **Local Rule 4001-2(a)(i)(U)** Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof | None. | — |
| **Local Rule 4001-2(a)(i)(V)** Provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code | None. | — |
| **Local Rule 4001-2(a)(i)(W)** | None. | — |

| HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2[6] | | |
|---|---|---|
| *Term* | *Summary* | *Source* |
| Provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code | | |
| **Local Rule 4001-2(a)(i)(X)**<br><br>Provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine | None. | — |

## NEED FOR FINANCING AND USE OF CASH COLLATERAL

21.     The Debtors have an urgent and immediate need for access to funds available under the DIP Loan.  Such funding is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to have sufficient liquidity to orderly wind down their assets.  Without immediate access to the DIP Loan, the Debtors would be forced to terminate the wind down, which would irreparably damage the Debtors' efforts to preserve value available for distribution to its creditors, including its customers.  Accordingly, the Debtors strongly urge the Court to authorize the DIP Loan on the terms contemplated herein, initially on an interim basis and, following a final hearing, on a final basis.

## BASIS FOR RELIEF

**A.     The Debtors Should Be Permitted to Obtain Post-petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

22.     Section 364(c) of the Bankruptcy Code provides as follows:

> (c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)        with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

(2)        secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)        secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

23.      To satisfy the standards of section 364 of the Bankruptcy Code, a debtor is not required to seek credit from every possible source: "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  Rather, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c).  *Id.*; *see also In re Ames*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

24.      There are no prohibitions in the Bankruptcy Code for an insider or an affiliate of an insider to make a debtor-in-possession loan.  *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (presiding court allowed priming debtor-in-possession loan from shareholders of the debtor); *Bland v. Farmworker Creditors* (*In re Bland*), 308 B.R. 109 (S.D. Ga. 2003) (recognizing that courts can approve post-petition loans from insiders).

25.      The Debtors have satisfied the requirements of sections 364(c) because, under current circumstances, the Debtors are unable to obtain credit other than as provided in this Motion. Specifically, the Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative claim, and the DIP Lender is unwilling to provide financing

without the protection of a super-priority claim.  Given the current state of the cryptocurrency industry and the wind down of the U.S. and Malta operations of the Debtors, the Debtors firmly believe that the financing to be provided as contemplated by the Interim Order represents the best financing available to the Debtors for their immediate needs at this time, especially given that the proposed financing is completely unsecured.  Approval of the proposed Interim Order on an emergency basis is thus warranted pending the Final Hearing and thereafter pursuant to the proposed Final Order.

26.    A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

27.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten

the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

28.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *see In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (discussing deference generally to the trustee of an estate); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

29.     In the exercise of their business judgment, the Debtors have concluded that the DIP Lender is the only lender willing and able to offer a post-petition credit facility that meets the Debtors' working-capital needs on the terms, and within the timeframe, required by the Debtor. Courts routinely defer to the business judgment of the debtor on most business decisions, including borrowing decisions.  *See, e.g.*, *In re Weaver Oil Co., Inc.*, 2008 WL 8202063, at *2 (Bankr. N.D. Fla. 2008) ("Under the 'business judgment rule', the Bankruptcy Court recognizes that it is 'no more equipped to make subjective business decisions for insolvent businesses than [the Court is] for solvent businesses,' and the formulation of the business judgment rule in corporate litigation is also the appropriate formulation of the business judgment rule in the Bankruptcy Court"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. at 511-13 (Bankr. D. Utah 1981) (courts

generally will not second-guess a trustee's business decisions where those decisions constitute "a business judgment made in good faith, upon a reasonable basis, and within the scope of its authority under the Code"). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A*., 762 F.2d 1303, 1311 (5th Cir. 1985).

30.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co*. (*In re Ellingsen MacLean Oil Co*.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

31.     The terms of the DIP Loan Agreement were negotiated in good faith and at arm's length between the Debtors and the DIP Lender (utilizing separate counsel and the independent director of Bittrex, Inc., with the assistance of the Debtors' Co-Chief Restructuring Officer, to negotiate the business terms on behalf of the Debtors), resulting in an agreement that is designed to permit the Debtors to preserve the value of their assets and to effectuate an orderly wind down. The DIP Lender is the parent company of the Debtors and is willing to provide funding on beneficial terms and on an unsecured basis that is more favorable than any other financing available to these estates.  The Debtors submit that the proposed terms of the DIP Loan are fair, reasonable, and appropriate under the circumstances.  *See, e.g., Bray v. Shenandoah Fed. Sav. and Loan Ass'n* (*In re Snowshoe Co*.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western*

*Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing post-petition financing that would preserve the value of the debtor's assets).

32.      Unless the Debtors have access to the DIP Loan to cover immediate obligations, they will not have sufficient funds to continue to preserve the Debtors' assets pending the orderly wind down of their operations.  The use of funds provided by the DIP Loan to preserve the value of the Debtors' assets for distribution to all stakeholders is clearly in the best interests of the Debtors' estates.

33.      Based on the circumstances present here and the grounds and authorities set forth above, the Debtors firmly believe that the financing sought is the best financing available and that it is in the best interests of their estates and creditors to enter into the DIP Loan.

34.      For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Loan in order to allow the Debtors to gain access to needed financing and thereby preserve value for all constituents through the orderly wind down.

35.      The Debtors request that this Court enter the interim order, set a final hearing on this Motion, and authorize utilization of funds from the DIP Loan for the remainder of this Chapter 11 case subject to the limitations set forth in the attached proposed interim order and any final order entered by the Court.

**B.      Interim Order and Final Hearing**

36.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

37.      The urgent need to preserve wind down value, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to access the DIP Loan, pending the Final Hearing, in order to continue their operations and to allow the Debtors to

administer their cases.  Without the ability to make draws under the DIP Loan, the Debtors would be unable to meet their obligations in the wind down, thus causing irreparable harm to the Debtors and the value of these estates available for distribution to all stakeholders, including Debtors' customers and other creditors.  Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## NOTICE OF MOTION

38.     The Debtors will provide notice of this Motion to the following parties, or their counsel, if known: (a) the Office of the United States Trustee; (b) counsel for the DIP Lender; (c) the Debtors' fifty largest unsecured creditors on a consolidated basis; and (d) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first-day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NOTICE WITH RESPECT TO FINAL HEARING

39.     No trustee, examiner, or statutory committee has been appointed in these Cases. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon the following parties, or their counsel, if known: (a) the Office of the United States Trustee; (b) counsel for the DIP Lender; (c) the Debtors' fifty

largest unsecured creditors on a consolidated basis; and (d) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## NO PRIOR REQUEST

40.    No prior request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors request entry of the Interim Order and the Final Order under sections 105, 363, and 364 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2: (a) authorizing the Debtors to incur post-petition debt, (b) granting super-priority claims in favor of the DIP Lender, (c) scheduling a final hearing, and (d) granting related relief.

Date: May 8, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/  Robert S. Brady*
Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Joshua Brooks (Delaware Bar No. 6765)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com
Email: jbrooks@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani *(pending pro hac vice)*
Patricia B. Tomasco *(pending pro hac vice)*
Daniel Holzman *(pending pro hac vice)*
Alain Jaquet *(pending pro hac vice)*

Razmig Izakelian *(pending pro hac vice)*
Valerie Ramos (*pending pro hac vice*)
Joanna D. Caytas *(pending pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**PROPOSED COUNSEL FOR THE DEBTORS**

# **EXHIBIT A**

## **Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. |

**INTERIM ORDER: (A) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION DEBT, (B) GRANTING SUPER-PRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) SCHEDULING A FINAL HEARING, AND (D) GRANTING RELATED RELIEF**

(1)     This matter is before the Court on the Motion (the "Motion") of Desolation Holdings LLC and its affiliated debtors, Bittrex, Inc., Bittrex Malta Holdings Ltd., and Bittrex Malta Ltd., as debtors and debtors in possession (collectively, the "Debtors" and, together with their non-debtor affiliates, "Bittrex"), in these chapter 11 cases (the "Chapter 11 Cases"), requesting entry of an interim order (this "Interim Order") and a final order (the "Final Order") pursuant to sections 105(a), 363, and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Bankruptcy Rules"): (1) authorizing the Debtors to obtain post-petition financing from Aquila Holdings Inc. (or its designee) (the "DIP Lender"), consisting of a super-priority delayed draw credit facility in the principal amount of up to 700 BTC (the "DIP Loan") to be used for general wind down and liquidity purposes, including the payment of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

Administrative Expenses, as described herein and in that certain *Superpriority Debtor-In-Possession Credit Agreement*, dated May 8, 2023, by and among the DIP Lender, as lender, and the Debtors, as borrower (substantially in the form attached to the Motion, together with all schedules, exhibits and annexes thereto, and as any time amended, the "DIP Loan Agreement"), of which amount 250 BTC will be available under the DIP Loan on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Loan Documents (as defined in the DIP Loan Agreement) and in this Interim Order;

(2)      authorizing the Debtors to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorizing the Debtors to use proceeds of the DIP Loan solely as expressly permitted in the DIP Loan Documents and in accordance with this Interim Order;

(4)      pursuant to Bankruptcy Code section 364(c)(1), granting the DIP Lender an allowed super-priority administrative expense claim against the Debtors for the amounts advanced under the DIP Loan (the "DIP Super-priority Claims") (without the need to file any proofs of claim or request for payment of administrative expenses), with priority over any and all administrative expenses of any kind or nature, subject only to the Carve-Out, and the DIP Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtor and all proceeds thereof.  Except as set forth in, or permitted by, this Interim Order, or with the consent of the DIP Lender, no other super-priority administrative expense claims shall be granted or allowed in the Chapter 11 Cases.  The DIP Super-priority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(6)     authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

(7)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

(8)     granting the Debtors such other and further relief as is just and proper.

Based upon the Court's review of the Motion, the exhibits attached thereto, the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of the Chapter 11 Petition and First Day Motions* (the "First Day Declaration") and all matters brought to the Court's attention at the interim hearing, which was held on May [_], 2023, pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) (the "Interim Hearing"), and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, AND ADJUDGED,** that:[2]

1.     Disposition.  The Motion is hereby GRANTED, as and to the extent provided herein.  Any and all objections to the relief requested in the Motion, to the extent not otherwise withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

2.     Jurisdiction; Core Proceeding.  This Court has jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C.  § 1334.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

3.     <u>Service of Motion and Notice of Interim Hearing</u>.  The Debtors have caused to be served a notice of the Motion and the Interim Hearing, including a copy of the proposed Interim Order and Budget (as defined below), by electronic mail, telecopy transmission, hand delivery, overnight courier, or first class United States mail upon the Office of the United States Trustee (the "U.S. Trustee"), the consolidated 30 largest unsecured creditors of the Debtors, the Internal Revenue Service, all parties who have filed requests prior to the date of service for notices under Rule 2002 of the Bankruptcy Rules, and all parties known by a Debtor to hold or assert a lien on any asset of a Debtor.  The foregoing notice of the Motion, as it relates to this Interim Order and the Interim Hearing, is appropriate, due, and sufficient under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b), (c) and (d), and that no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.     <u>Petition Date</u>.  On May 8, 2023 (the "Petition Date"), each of the Debtors filed with the Court its respective voluntary petition for relief under chapter 11 of the Bankruptcy Code, and each is continuing to manage its properties and to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for any Debtor herein.

5.     <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in Paragraph 26 below), each Debtor admits, stipulates, acknowledges, and agrees as follows:

        a.     <u>Need for Financing</u>.  An immediate and ongoing need exists for the Debtors to obtain the DIP Loan in order to permit, among other things, the orderly wind down of the operation of their U.S. and Malta businesses.  The Debtors do not have sufficient available resources of working capital to orderly wind down their businesses without post-petition financing.  The Debtors' ability to orderly

wind down their U.S. and Malta businesses is essential to the Debtors' preservation of the value of their assets for distribution to all stakeholders, including customers and other creditors.

6.     Findings Regarding the DIP Loan.

    a.     Good Cause.   Good cause has been shown for the entry of this Interim Order and authorization for the Debtors to incur DIP Obligations (as defined below) pursuant to the DIP Loan Agreement as hereinafter provided up to the Interim Amount Limit during the Interim Period.   Each Debtor's need for financing of the type afforded by the DIP Loan Agreement is immediate and critical. Entry of this Interim Order will preserve the assets of each Debtor's estate and its value for distribution to all stakeholders.  The terms of the proposed financing are fair and reasonable, reflect each Debtor's exercise of business judgment, and are supported by reasonably equivalent value and fair consideration.

    b.     Proposed DIP Loan.   The Debtors have requested that the DIP Lender establish the delayed draw DIP term loan facility pursuant to which the Debtors may obtain advances from time to time ("Advances") (the "DIP Loan," and collectively with all other debts, obligations, liabilities, and indemnities of the Debtors under the DIP Loan Documents, the "DIP Obligations"), all in accordance with and subject to the terms of the DIP Loan Documents.  The DIP Lender is willing to establish the DIP Loan upon the terms and conditions set forth herein and in the DIP Loan Agreement, substantially in the form attached to the Motion, and the other DIP Loan Documents.

    c.     No Credit Available on More Favorable Terms.     The terms of the DIP Loan Documents are favorable and it is unlikely that better terms could otherwise be obtained.  The Debtors are also unable to obtain unsecured credit allowable under Section 364(c)(1) of the Bankruptcy Code without granting DIP Super-priority Claims (as defined in Paragraph 9 below) under the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.

    d.     Budget/Reporting.     The Debtors have prepared and annexed to this Interim Order as **Exhibit 1** hereto a budget (as at any time amended or supplemented with the written consent of the DIP Lender, the "Budget") which sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby and which the Debtors believe in good faith to be realistic and achievable.  The DIP Lender is relying upon the Budget in entering into the DIP Loan Agreement.  On the fourth business day of each calendar month from and after the initial advance of the DIP

Loan, the Debtors shall deliver to the DIP Lender, in a form reasonably acceptable to the DIP Lender, a monthly variance report variance report showing all receipts and disbursements of the Debtors during the prior month and on a cumulative basis for the Chapter 11 Cases, along with any variances on a line item basis against the Budget.

e.  Certain Conditions to DIP Loan.  The DIP Lender's willingness to make DIP Loan pursuant to the DIP Loan Documents is conditioned upon, among other things, (i) the Debtors obtaining Court approval of the DIP Loan Agreement and all DIP Obligations of the Debtors and all rights and remedies of the DIP Lender thereunder; and (ii) the DIP Lender receiving, as a benefit for the prompt payment of all DIP Obligations, a super-priority on its claim as set forth herewith.

f.  Interim Hearing.  Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2, the Court has held the Interim Hearing and hereby authorizes Debtors to obtain DIP Loan during the period from the date of entry of this Order through the date on which the final hearing on the Motion pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) scheduled pursuant to Paragraph 24 of this Interim Order is concluded (the "Interim Period"), for purposes specified in the initial Budget.

g.  Finding of Good Faith.  Based upon the record presented at the Interim Hearing, the DIP Loan was negotiated in good faith and at arm's-length between the Debtors and the DIP Lender.  All of the DIP Obligations including, without limitation, the DIP Loan made pursuant to the DIP Loan Agreement and all other liabilities and obligations of any Debtors under this Interim Order owing to the DIP Lender shall be deemed to have been extended by the DIP Lender in "good faith," as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code.  The DIP Lender shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

h.  Immediate Entry.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the interim relief sought by the Motion, each Debtor's estate will be immediately and irreparably harmed pending the Final Hearing. The Debtors' consummation of the DIP Loan in accordance with the terms of this Interim Order and the DIP Loan Agreement is

6

consistent with each Debtor's exercise of its fiduciary duties. Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules. No further notice of the relief sought at the Interim Hearing is necessary or required.

7. <u>Authorization of Interim Financing; Use of Proceeds</u>.

    a.    The Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Loan Agreement in substantially the form annexed to the Motion (with such changes, if any, as were made prior to or as a result of the Interim Hearing or are otherwise authorized to be made as amendments to the DIP Loan Agreement in accordance with this Interim Order) and all DIP Loan Documents.

    b.    The Debtors are hereby authorized to borrow money pursuant to the DIP Loan Documents, on the terms and subject to the conditions, set forth in any DIP Loan Document and this Interim Order, up to an aggregate outstanding principal amount at any time not exceeding the sum of 700 BTC, plus applicable interest, expenses, fees and other charges payable in connection with such DIP Loan, and to incur any and all liabilities and obligations under the DIP Loan Documents and to pay all principal, interest, fees, expenses and other obligations provided for under the DIP Loan Documents (including any obligations, to the extent provided for in the DIP Loan Documents, to indemnify the DIP Lender).

    c.    The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Loan, and the DIP Lender may rely upon each Debtor's representations that the amount of DIP Loan requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

    d.    No proceeds of any DIP Loan shall be used to (i) make any payment in settlement or satisfaction of any pre-petition claim, unless such payment is permitted under the DIP Loan Documents and by order of this Court; or (ii) to make any payment otherwise prohibited by this Interim Order.

8. <u>Execution, Delivery and Performance of DIP Loan Documents</u>. The DIP Loan Documents may be executed and delivered on behalf of each Debtor by any officer, director, or agent of such Debtor, who by signing shall be deemed to represent himself or herself to be duly

authorized and empowered to execute the DIP Loan Documents for and on behalf of such Debtor. The DIP Lender shall be authorized to rely upon any such person's execution and delivery any of the DIP Loan Documents as having been done with all requisite power and authority so to do, and the execution and delivery of any of the DIP Loan Documents or amendments thereto by any such person on behalf of such Debtor shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such Debtor.  Upon execution and delivery thereof, each of the DIP Loan Documents shall constitute valid and binding obligations of each Debtor, enforceable against each Debtor in accordance with their terms for all purposes during its Chapter 11 Case, any subsequently converted case of such Debtor under Chapter 7 of the Bankruptcy Code (each, a "Successor Case"), and after the dismissal of its Chapter 11 Case with respect to those provisions of the DIP Loan Documents which expressly survive the Termination Date and any such dismissal.  Subject to Paragraph 26 of this Interim Order, no obligation, payment, or transfer under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Sections 502(d), 544, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  In furtherance of the provisions of Paragraph 7 of this Interim Order, each Debtor is authorized to do and perform all acts:  to make, execute and deliver all instruments and documents (including, without limitation, amendments, waivers, consents, and other modifications) and to pay all reasonable fees, costs and expenses in each case as may be necessary or, in the opinion of the DIP Lender, desirable to give effect to any

of the terms and conditions of the DIP Loan Documents, or as may otherwise be required or contemplated by the DIP Loan Documents.

9.      <u>Super-priority Claims</u>. All DIP Obligations shall constitute joint and several allowed super-priority administrative claims (the "DIP Super-priority Claims") against the Debtors (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities, and indebtedness of each Debtor, whether now in existence or hereafter incurred by any Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order approving the grant), 507, 546(c), 552(b) 726, 1113, or 1114 of the Bankruptcy Code.  Such DIP Super-priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre-petition and post-petition property of Debtors and all proceeds thereof; *provided*, *however*, that the DIP Super-priority Claims shall be subject to the Carve-Out (as defined in Paragraph 14).  In addition to all rights of indemnity and subrogation any Debtor may have under applicable law, each Debtor agrees that in the event such Debtor is the initial obligor of an Obligation (the "Obligor Debtor"), for which a payment is made by another Debtor (the "Paying Debtor"), the Obligor Debtor shall indemnify the Paying Debtor for the full amount of such payment (in all cases after payment of the Obligations to the DIP Lender in full), and the Paying Debtor shall be subrogated to the rights of the party to whom such payment shall have been made to the extent of such payment (in all cases after payment of the Obligations to the DIP Lender in full).

10.     _Repayment_.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without offset or counterclaim.  Without limiting the generality of the foregoing, in no event shall any Debtor be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Lender to any Debtor or any of its respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of DIP Lender that would be affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender. The DIP Loan will be made in BTC and repayment of the principal amount of the DIP Loan will be in BTC.  All other DIP Obligations will be repaid, at the Debtors' option, in BTC, U.S. dollars, or any combination thereof.  If the Debtors do not have sufficient BTC on hand to repay at maturity the full principal amount of the DIP Loan in BTC and there is a shortfall, the Debtors will use the currencies they possess at that time of repayment to acquire the additional BTC to pay that shortfall.  The amount of BTC the Debtors may need to acquire to pay such shortfall shall be capped at a number of BTC equal to 110% of the value of the shortfall on the Petition Date.

11.     _Payments Free and Clear_.  Any and all payments or proceeds remitted to the DIP Lender shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order approving the grant) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

12.     _Fees and Expenses of Estate Professionals_.  Subject to the terms of the DIP Loan Agreement and the Budget, for so long as no Event of Default has occurred, each Debtor is authorized to use the DIP Loan to pay such compensation and expense reimbursement

(collectively, "Professional Fees") of professional persons (including attorneys, financial advisors, accountants, investment bankers, claims and/or noticing agents, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional (the "Debtors Professionals") or any official committee appointed in the Chapter 11 Cases (the "Committee") with Court approval (the "Committee Professionals," collectively with the Debtors Professionals, the "Professionals"), up to the amounts set forth for each Professional in the Budget and only to the extent that such compensation and expense reimbursement is allowed and approved by the Court (including through any interim compensation procedures approved by the Court); *provided*, *however*, that, notwithstanding anything herein or in any other order of this Court to the contrary, no proceeds of the DIP Loan shall be used to pay Professional Fees incurred for any Prohibited Purpose (as defined below).

13. <u>Section 506(c) Claims</u>.  Effective upon entry of the Final Order, no costs or expenses of administration shall be imposed upon the DIP Lender pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Lender from the payments or proceeds remitted to the DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender, provided that the Carve-Out is fully funded by the Debtors.

14. <u>Carve-Out</u>.  Notwithstanding anything in this Interim Order, any DIP Loan Documents, or any other order of this Court to the contrary, the DIP Obligations and the DIP Super-priority Claims in favor of the DIP Lender shall be subject and subordinate in all respects to the payment of the following Carve-Out.  As used in this Interim Order, the "Carve-Out" means, collectively, the aggregate amount needed for (i) accrued but unpaid fees, costs, and expenses of the professionals of the Debtors and the Committee incurred at any time prior to the DIP Lender's

delivery of a Carve-Out Trigger Notice, up to the amounts set forth for each Professional in the Budget for such time period and only to the extent allowed by the Bankruptcy Court, (ii) professional fees, costs and expenses of the Debtors and the Committee incurred after delivery of a Carve-Out Trigger Notice not to exceed $250,000 with respect to the Professionals, to the extent allowed by the Bankruptcy Court, and (iii) the payment of fees and expenses pursuant to 28 U.S.C. § 1930; *provided*, that nothing in this Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out.  In no event shall the Carve-Out, or the funding of the DIP Loan to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations.  "Carve-Out Trigger Notice" means written notice by the DIP Lender to the Debtors invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default.

15.    <u>Excluded Professional Fees</u>.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of the DIP Loan in any respect, shall be used to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following (each a "Prohibited Purpose"): (a) objecting to or contesting the validity or enforceability of this Interim Order or any DIP Loan; (b) asserting or prosecuting any claim or cause of action against the DIP Lender, other than to enforce the terms of the DIP Loan or this Interim Order; (c) seeking to modify any of the rights granted under this Interim Order to the DIP Lender; or (d) objecting to, contesting, delaying, preventing or interfering in any way with the exercise of rights and remedies by the DIP Lender after the occurrence and during the continuance of an Event of Default, provided that the Debtors may contest or dispute whether an

Event of Default has occurred and shall be entitled to any notice provisions provided in this Interim Order.

16.   <u>Preservation of Rights Granted Under This Interim Order</u>.

a.   <u>Protection from Subsequent Financing Order</u>.  There shall not be entered in any of the Chapter 11 Cases or in any Successor Case any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that is entitled to a security interest in any of the Debtors' assets or priority administrative status that is equal or senior to the DIP Super-priority Claims granted to the DIP Lender herein; *provided*, *however*, that nothing herein shall prevent the entry of an order that specifically provides for, as a condition to the granting of the benefits of clauses (i) or (ii) above, the full payment of all of the DIP Obligations, in the manner required by the DIP Loan Agreement, from the proceeds of such credit or indebtedness, and the termination of any funding commitments under the DIP Loan.

b.   <u>Rights Upon Dismissal, Conversion, or Consolidation</u>.  If any of the Chapter 11 Cases are dismissed, converted, or substantively consolidated with another case, then neither the entry of this Interim Order nor the dismissal, conversion, or substantive consolidation of any of the Chapter 11 Cases shall affect the rights or remedies of the DIP Lender under the DIP Loan Documents or the rights or remedies of the DIP Lender under this Interim Order, and all of the respective rights and remedies hereunder and thereunder of the DIP Lender shall remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, or substantively consolidated. Unless and until full payment of all DIP Obligations, in the manner required by the DIP Loan Agreement, has occurred, it shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Super-priority Claims shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until full payment of all DIP Obligations, in the manner required by the DIP Loan Agreement, (ii) such DIP Super-priority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest, (iii) the other rights granted by this Interim Order shall not be affected, including the rights granted by Paragraph 26 of this Interim Order, and (iv) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this Interim Order.

      c.        <u>Survival of Interim Order</u>.  The provisions of this Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases or any Successor Case.

      d.        <u>No Discharge</u>.  None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Debtor has waived such discharge.

      e.        <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar date order establishing a deadline for the filing of proofs of claim entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, the DIP Lender shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Loan Documents or prejudice or otherwise adversely affect any rights, remedies, powers, or privileges of the DIP Lender under any of the DIP Loan Documents or under this Interim Order.

      17.    <u>Amendments to DIP Loan Documents</u>.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to and modifications of any of such DIP Loan Documents on the following conditions: (a) the amendment or modification must not constitute a Material Change (as defined below) to the terms of such DIP Loan Documents and (b) copies of the amendment or modification must be served upon counsel for the Committee (and, prior to the appointment of a Committee, upon the Debtors' consolidated 30 largest unsecured creditors), the U.S. Trustee and other interested parties specifically requesting such notice.  Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "Material Change" shall mean a change to a DIP Loan Document that

operates to shorten the DIP Loan or the maturity of the DIP Obligations, to increase the aggregate

amount of the commitments of the DIP Lender under the DIP Loan, to increase the rate of interest

other than as currently provided in or contemplated by the DIP Loan Documents, to add specific

Events of Default, or to enlarge the nature and extent of remedies available to the DIP Lender

following the occurrence of an Event of Default.  Without limiting the generality of the foregoing,

any amendment of a DIP Loan Document to postpone or extend any date or deadline therein

(including, without limitation, the expiration of the term of the DIP Loan) shall not constitute a

Material Change and may be effectuated by Debtors and the DIP Lender without the need for

further approval of the Court.

18. <u>Events of Default; Remedies</u>.

a. <u>Events of Default</u>.    The occurrence of any "Event of Default" under (and as defined in) the DIP Loan Agreement shall constitute an Event of Default under this Interim Order.

b. <u>Default Remedies</u>.    Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors, (a) send the Carve-Out Trigger Notice and (b) declare (i) the unpaid principal amount of and accrued interest on the Loans and (ii) all other DIP Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become immediately due and payable, and the obligation of the DIP Lender to make any Loans, and the Commitment, shall thereupon terminate.    Upon the occurrence and during the continuance of any Event of Default, the DIP Lender shall be required to obtain the authority of this Court to exercise any rights and remedies of the DIP Lender forth in any of the Loan Documents, in addition to all rights and remedies allowed by the United States and any state thereof.

c. <u>Rights Cumulative</u>.    The rights, remedies, powers, and privileges conferred upon DIP Parties pursuant to this Interim Order shall be in addition to and cumulative with those contained in the applicable DIP Loan Documents.

19.    <u>Effect of Stipulations on Third Parties; Deadline for Challenges</u>.

      a.      Each Debtor's admissions, stipulations, agreements, and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding upon such Debtor and any successor thereto (including, without limitation any Chapter 7 trustee or Chapter 11 trustee or examiner appointed or elected for such Debtor) under all circumstances and for all purposes.

      b.      Each Debtor's admissions, stipulations, agreements, and releases contained in this Interim Order, including, without limitation, those contained in Paragraph 5 of this Interim Order, shall be binding upon all other parties in interest (including, without limitation, any Committee) under all circumstances and for all purposes unless the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.

20.    <u>Service of Interim Order</u>.  Promptly after the entry of this Interim Order, the Debtors shall mail, by first class mail, a copy of this Interim Order, the Motion (and all exhibits attached to the Motion), and a notice of the Final Hearing, to (without duplication) counsel for the DIP Lender, the U.S. Trustee, counsel for the Committee (or, if the Committee has not been formed and selected counsel as of the entry of this Interim Order, then the Debtors' consolidated fifty largest unsecured creditors), the Internal Revenue Service, all parties who have filed requests for notices under Rule 2002 of the Bankruptcy Rules prior to the time of such service, and all parties known by a Debtor to hold or assert a lien on any assets of a Debtor, and shall file a certificate of service regarding same with the Clerk of the Court.  Such service shall constitute good and sufficient notice of the Final Hearing and the relief sought by the Debtors pursuant to the proposed Final Order.

21.    <u>No Deemed Control</u>.  In determining to make any Advance under the DIP Loan, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order, or the DIP Loan Documents, the DIP Lender shall not be deemed to be in control of any Debtor or its operations.

22.    <u>Exculpation</u>.  Nothing in this Interim Order, the DIP Loan Documents, or any other document related to the DIP Loan shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the pre-petition or post-petition activities of any Debtor in the operation of its business or in connection with its restructuring efforts.

23.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of the DIP Loan Documents and this Interim Order, including all findings herein (subject to Paragraph 26 of this Interim Order) shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lender, the Debtors, the Committee, and their respective successors and assigns (including any Chapter 11 trustee hereafter appointed for the estate of any Debtor, any Chapter 7 trustee appointed or elected in a Successor Case, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any Debtor or with respect to the property of the estate of any Debtor), and shall inure to the benefit of DIP Lender and its respective successors and assigns.

24.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order shall be held at ___:00 _.m., prevailing Eastern time on _____, 2023, at Courtroom __, United States Bankruptcy Court, 824 Market Street North, Wilmington, Delaware 19801.  The Final Hearing may be adjourned or postponed without further notice except as may be announced in open Court or posted on the Court's docket.  If any or all of the provisions of this Interim Order are modified, vacated, or stayed as the result of any Objection (as defined below) timely filed and asserted at the Final Hearing, then, without limiting the provisions of Paragraph 26 hereof, any DIP Obligations incurred prior to the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to

the protections afforded under Section 364(e) of the Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, without limitation, the DIP Super-priority Claims granted herein and pursuant to the DIP Loan Documents with respect to all such DIP Obligations.

25.     Objection Deadline.  If any party in interest shall have an objection to any of the provisions of this Interim Order, any provisions of the DIP Loan Documents, or any provisions of the proposed Final Order (collectively, an "Objection"), such party may assert such Objection at the Final Hearing, if a written statement setting forth the basis for such Objection is filed with the Court and concurrently served so as to be received on or before ___:00 _.m.,  prevailing  Eastern time on _____, 2023, by the following: (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel for the Debtors, Quinn Emanuel Urquhart & Sullivan, LLP, Attn.: Patricia B. Tomasco, Joanna D. Caytas, 711 Louisiana Street, Suite 500, Houston, TX 77002; Quinn Emanuel Urquhart & Sullivan, LLP, Attn.:  Daniel Holzman,  51  Madison  Avenue,  22nd  Floor,  New  York,  New  York  10010;  email: pattytomasco@quinnemanuel.com, danielholzman@quinnemanuel.com, joannacaytas@quinnemanuel.com; and (c) counsel for the DIP Lender, Pachulski Stang Ziehl & Jones LLP, Attn.:  Laura Davis Jones, 919 North Market Street, 17th Floor, Wilmington, DE 19801, email:  ljones@pszjlaw.com.  If an objecting party shall fail to appear at the Final Hearing and assert the basis for such Objection before the Court, such Objection shall be deemed to have been waived and abandoned by such objecting party.

26.     Effectiveness; Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal

18

Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

27.    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for any Debtor notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

28.    <u>Inconsistencies</u>.  To the extent of any inconsistencies or conflicts between this Interim Order and the DIP Loan Documents, this Interim Order shall govern.

**<u>EXHIBIT 1</u>**

**BUDGET**

**Bittrex, Inc. and Other Debtor Entities**
*DIP Budget*
*$ in 000's*

| | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Post-Pet. 13Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Week** | | | | | | | | | | | | | | |
| **Fiscal Month** | May-23 | May-23 | May-23 | Jun-23 | Jun-23 | Jun-23 | Jun-23 | Jul-23 | Jul-23 | Jul-23 | Jul-23 | Jul-23 | Aug-23 | |
| **Week Ending** | 5/14/23 | 5/21/23 | 5/28/23 | 6/4/23 | 6/11/23 | 6/18/23 | 6/25/23 | 7/2/23 | 7/9/23 | 7/16/23 | 7/23/23 | 7/30/23 | 8/6/23 | |
| **Fcst / Actual** | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* | *Proj* |
| | *Post-Petition* | | | | | | | | | | | | | |
| **I. Inflows** | | | | | | | | | | | | | | |
| 1.) Intercompany Receipts | - | 25 | 1,664 | 27 | 667 | 2,127 | 38 | 1,676 | 656 | 2,127 | 38 | 1,676 | (179) | 10,542 |
| 2.) Non-Operating Receipts | - | - | 98 | - | - | - | - | 98 | - | - | - | 98 | - | 295 |
| **3.) Total Receipts** | **-** | **25** | **1,762** | **27** | **667** | **2,127** | **38** | **1,774** | **656** | **2,127** | **38** | **1,774** | **(179)** | **10,837** |
| **II. Operating Disbursements** | | | | | | | | | | | | | | |
| 4.) Intercompany Disbursements | (25) | (1,664) | (27) | (667) | (2,127) | (38) | (1,676) | (656) | (2,127) | (38) | (1,676) | 179 | (863) | (11,405) |
| 5.) Payroll, Taxes & Benefits | - | (202) | - | - | (128) | - | (202) | - | (128) | - | (202) | - | - | (862) |
| 6.) Rent / Leases / Occupancy | - | - | (216) | - | - | - | - | (216) | - | - | - | (216) | - | (649) |
| 7.) Software and Infrastructure | - | - | - | (40) | - | - | - | (47) | - | - | - | - | (41) | (128) |
| 8.) Ordinary Course Professionals | - | - | - | (840) | - | - | - | (640) | - | - | - | - | (655) | (2,135) |
| 9.) Other Operating Expenses | (25) | (25) | (25) | (64) | (25) | (25) | (25) | (64) | (25) | (25) | (25) | (25) | (64) | (442) |
| **10.) Total Operating Disbursements** | **(50)** | **(1,891)** | **(268)** | **(1,610)** | **(2,280)** | **(63)** | **(1,903)** | **(1,623)** | **(2,280)** | **(63)** | **(1,903)** | **(63)** | **(1,623)** | **(15,620)** |
| **III. Non-Operating Costs** | | | | | | | | | | | | | | |
| 11.) Restructuring Costs | - | - | - | (288) | (50) | - | - | - | (481) | (1,554) | - | - | (635) | (3,007) |
| **12.) Total Non-Operating Costs** | **-** | **-** | **-** | **(288)** | **(50)** | **-** | **-** | **-** | **(481)** | **(1,554)** | **-** | **-** | **(635)** | **(3,007)** |
| **13.) Total Disbursements** | **(50)** | **(1,891)** | **(268)** | **(1,899)** | **(2,330)** | **(63)** | **(1,903)** | **(1,623)** | **(2,761)** | **(1,616)** | **(1,903)** | **(63)** | **(2,258)** | **(18,628)** |
| **14.) Net Cash Flow** | **(50)** | **(1,866)** | **1,494** | **(1,872)** | **(1,663)** | **2,065** | **(1,866)** | **151** | **(2,105)** | **511** | **(1,866)** | **1,712** | **(2,436)** | **(7,791)** |
| **IV. Financing** | | | | | | | | | | | | | | |
| **Liquidity** | | | | | | | | | | | | | | |
| 15.) Beginning Cash Balance | 542 | 7,492 | 5,626 | 7,120 | 5,248 | 3,584 | 18,649 | 16,783 | 16,935 | 14,830 | 15,341 | 13,475 | 15,187 | 542 |
| 16.) Net Cash Flow | (50) | (1,866) | 1,494 | (1,872) | (1,663) | 2,065 | (1,866) | 151 | (2,105) | 511 | (1,866) | 1,712 | (2,436) | (7,791) |
| 17.) DIP Draw / (Paydown) | 7,000 | - | - | - | - | 13,000 | - | - | - | - | - | - | - | 20,000 |
| **18.) Ending Cash Balance** | **7,492** | **5,626** | **7,120** | **5,248** | **3,584** | **18,649** | **16,783** | **16,935** | **14,830** | **15,341** | **13,475** | **15,187** | **12,751** | **12,751** |

**<u>EXHIBIT B</u>**

**DIP Loan Agreement**

**SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of [May 8], 2023**

**among**

**BITTREX, INC.,**

**BITTREX MALTA HOLDINGS LTD.,**

**BITTREX MALTA LTD.,**

**and**

**DESOLATION HOLDINGS LLC,**

**each, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Borrower,**

**and**

**AQUILA HOLDINGS INC.,**

**as the Lender**

## TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS ..................................................................1
Section 1.1      Defined Terms. ...................................................................................1
Section 1.2      Use of Defined Terms. .......................................................................6
Section 1.3      Cross-References. ...............................................................................6

ARTICLE II

COMMITMENT, BORROWING PROCEDURES, AND NOTES ..................................6
Section 2.1      Commitment. ......................................................................................6
Section 2.2      Notes. .................................................................................................7
Section 2.3      Borrowing Procedures. ......................................................................7
Section 2.4      Use of Proceeds..................................................................................7
Section 2.5      Superpriority Nature of Obligations. .................................................7

ARTICLE III

REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ........................................8
Section 3.1      Repayments and Prepayments. ..........................................................8
Section 3.2      Interest Provisions.............................................................................8
Section 3.3      Rates...................................................................................................8
Section 3.4      Default Rate. ......................................................................................8
Section 3.5      Payment Dates. ..................................................................................9
Section 3.6      Application of Payments and Proceeds...............................................9
Section 3.7      Maximum Lawful Rate of Interest.....................................................9

ARTICLE IV

TAXES AND PAYMENTS ............................................................................................10
Section 4.1      Taxes. ...............................................................................................10
Section 4.2      Payments, Computations, etc............................................................11

ARTICLE V

CONDITIONS TO THE BORROWINGS .....................................................................11
Section 5.1      Conditions to the Borrowings Under Interim Order..........................11
Section 5.2      Conditions Precedent to Borrowings Under Final Order....................12

ARTICLE VI

REPRESENTATIONS AND WARRANTIES.................................................................13
Section 6.1      Corporate Existence and Power.  The Borrower: ...............................13
Section 6.2      Authorization. ..................................................................................13

Section 6.3        Governmental Authorization. .................................................................13
Section 6.4        Binding Effect. ......................................................................................13

ARTICLE VII

COVENANTS .................................................................................................................14
Section 7.1        Affirmative Covenants........................................................................14
Section 7.2        Negative Covenants. ...........................................................................15

ARTICLE VIII

EVENTS OF DEFAULT .................................................................................................15
Section 8.1        Event of Default..................................................................................15
Section 8.2        Action Upon the Occurrence of an Event of Default...........................16

ARTICLE IX

MISCELLANEOUS PROVISIONS.................................................................................17
Section 9.1        Waivers, Amendments, etc. ................................................................17
Section 9.2        Survival. ..............................................................................................18
Section 9.3        Severability. ........................................................................................18
Section 9.4        Headings. .............................................................................................18
Section 9.5        Execution in Counterparts, *etc.* .........................................................19
Section 9.6        Governing Law; Entire Agreement......................................................19
Section 9.7        Successors and Assigns........................................................................19
Section 9.8        Joint and Several Obligations. ............................................................19
Section 9.9        Assignment of Lender's Rights. ..........................................................19
Section 9.10       Forum Selection and Consent to Jurisdiction. ....................................20
Section 9.11       Waiver of Jury Trial............................................................................20
Section 9.12       Reimbursement of Costs and Expenses. ..............................................21
Section 9.13       Indemnity. ...........................................................................................21


Exhibit A – Form of Borrowing Request

Exhibit B – Form of Interim Order

Exhibit C – Form of Note

Schedule 1 – Authorized Persons

## SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** is dated as of [May 8], 2023 and entered into by and among Bittrex, Inc. ("**Bittrex**"), Bittrex Malta Holdings Ltd. ("**Malta Holdings**"), Bittrex Malta Ltd. ("**Malta Opco**"), and Desolation Holdings LLC, each as debtor and debtor-in-possession ("**Desolation**" and together with Bittrex, Malta Holdings, and Malta Opco, individually, collectively and in all combinations, the "**Borrower**"), and Aquila Holdings Inc. (or its designee), as lender (the "**Lender**").

### R E C I T A L S

**WHEREAS**, on May 8, 2023 (the "**Petition Date**"), each Borrower filed a voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such proceedings being administered under Case No. 23-10597 [(___)] and any other proceeding administered under the Bankruptcy Code, are hereinafter referred to as the "**Chapter 11 Cases**").  From and after the Petition Date, the Borrower intends and anticipates operating its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrower has requested that the Lender provide a superpriority debtor-in-possession delayed-draw term loan facility in the aggregate principal amount of up to 700 BTC, and the Lender is willing to do so, upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the Borrower and the Lender hereby agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Defined Terms.

The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Advances" shall have the meaning ascribed to such term in Section 2.1.

"Affiliate" means, with respect to a specified Person, (a) each Person that Controls, is Controlled by or is under common Control with such Person, (b) each of such Person's officers, directors, joint venturers, control persons, shareholders, partners and members, and (c) the family members, spouses and lineal descendants of individuals who are Affiliates of the Borrower.  For the purposes of this definition, the term "Affiliate" as it relates to the Borrower or its Subsidiaries shall specifically exclude the Lender and its Affiliates (other than any such Affiliate which is a Subsidiary or a direct or indirect holding company of such specified Person).

"Agreement" means, on any date, this Superpriority Debtor-in-Possession Credit Agreement as originally in effect on the Closing Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified and in effect on such date.

"Authorized Person" means any one of the individuals identified on Schedule 1, as such schedule is updated from time to time by written notice from the Borrower to the Lender.

"Bankruptcy Court" has the meaning set forth in the Recitals to this Agreement.

"Bankruptcy Code" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Borrower" shall have the meaning ascribed to such term in the Preamble to this Agreement.

"Borrowing" means a borrowing consisting of Advances made by the Lender.

"Borrowing Request" means an Advance request and certificate in substantially the form of **Exhibit A** hereto.

"BTC" means the digital currency bitcoin.

"Budget" means a budget approved by Financing Orders, as may be amended, supplemented, or modified from time to time with the Lender's written consent.

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in New York City.

"Cap Amount" means an amount of BTC equal to the Shortfall at the Petition Date Exchange Rate multiplied by 110%.

"Carve Out" shall have the meaning ascribed to such term in the Financing Orders.

"Carve-Out Trigger Notice" means written notice by the Lender to the Borrower invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default.

"Chapter 11 Cases" shall have the meaning ascribed to such term in the Recitals of this Agreement.

"Closing Date" means the first Business Day after the date on which the Interim Order is entered.

"Commitment" means the obligations of the Lender to make the Loan pursuant to Section 2.1.

"Commitment Amount" means the aggregate amount of 700 BTC.

"Committee" means any official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting

power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Current Exchange Rate" means the value of BTC in Dollars as determined using the close price of BTC to Dollars exchange rate then in effect on the Business Day immediately prior to the date of payment, as published by a recognized third-party source reasonably selected by the Borrower.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"DIP Superpriority Claim" shall have the meaning ascribed to such term in Section 2.5.

"Dollar" and the sign "$" mean lawful money of the United States.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender (i) franchise Taxes and Taxes imposed on or measured by net income, net receipts or capital of the Lender, in each case, imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax, (ii) U.S. federal withholding Taxes imposed on amounts payable hereunder to the extent payable pursuant to a law in effect on the date on which the Lender acquired its interest in the Loans or changes its lending office (except in each case to the extent that amounts with respect to such taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) U.S. federal withholding taxes imposed under sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended (the "Code"), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to section 1471(b)(1) of the Code or any intergovernmental agreements with respect thereto, and (iv) Taxes attributable to the Lender's failure to comply with Section 4.1(b).

"Event of Default" shall have the meaning ascribed to such term in Section 8.1.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"Final Order" shall mean the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court approving this Agreement and the other Loan Documents on a final basis, in form and substance satisfactory to the Lender, which among other matters but not by way of limitation (i) authorizes the Borrower to obtain credit and incur indebtedness under this Agreement, (ii) approves this Agreement, the Loan and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to have allowed superpriority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code, and which order or judgment is in effect and not stayed.

"Funding Date" means the date on which a Borrowing occurs.

"GAAP" means generally accepted accounting principles, as recognized by the American Institute of Certified Public Accountants and the Financial Accounting Standards Board.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, or any entity having the power of and exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular Section, paragraph or provision of this Agreement or such other Loan Document.

"including" means including without limiting the generality of any description preceding such term, and, for purposes of this Agreement and each other Loan Document, the parties hereto agree that the rule of *ejusdem generis* shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indemnified Taxes" shall mean (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement or any other Loan Document and (ii) to the extent not otherwise described in (i), Other Taxes.

"Interim Order" shall mean the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases substantially in the form of **Exhibit B** hereto or other form approved by the Lender, which among other matters but not by way of limitation (i) authorizes the Borrower to obtain credit and incur indebtedness under this Agreement, (ii) approves this Agreement, the Loan and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to have allowed superpriority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code, and which order or judgment is in effect and not stayed.

"Lender" shall have the meaning ascribed to such term in the Preamble to this Agreement.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, which in each case is to secure payment of a debt or performance of an obligation.

"Loan Principal Amount" shall have the meaning ascribed to such term in Section 3.1.4.

"Loans" means the Borrowings and any interest accrued thereon.

"Loan Documents" means this Agreement, the Notes, the Financing Orders and each other agreement, document, certificate, or instrument delivered in connection with this Agreement and the Notes.

"Material Adverse Effect" means, other than the events leading up to the filing and the effects of the filing of the Chapter 11 Cases and the filing and effects of the Chapter 11 Cases which shall not be deemed to constitute or give rise to a Material Adverse Effect, a material adverse effect on (i) the ability of the Borrower to perform its obligations under the Loan Documents, or

(ii) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Lender under the Loan Documents.

"<u>Maturity Date</u>" means the date which is nine (9) months from the Closing Date.

"<u>Maximum Lawful Rate</u>" shall have the meaning ascribed to such term in Section 3.7.

"<u>Note</u>" means the promissory notes of the Borrower payable to the Lender, in the form of **Exhibit C** hereto (as such promissory notes may be amended, endorsed or otherwise modified from time to time), evidencing the Loan, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"<u>Obligations</u>" means all obligations (monetary or otherwise) of the Borrower arising under or in connection with this Agreement, each Note and each other Loan Document, whether in respect of the due and punctual payment of principal, interest, fees, costs, expenses, indemnities, damages or other liabilities hereunder or thereunder, or the due and punctual performance of all covenants, agreements and duties of the Borrower hereunder or thereunder, or otherwise.

"<u>Obligor Borrower</u>" shall have the meaning ascribed to such term in Section 2.5.

"<u>Other Taxes</u>" shall have the meaning ascribed to such term in Section 4.1(a).

"<u>Paying Borrower</u>" shall have the meaning ascribed to such term in Section 2.5.

"<u>Person</u>" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

"<u>Petition Date</u>" shall have the meaning ascribed to such term in the <u>Recitals</u> to this Agreement.

"<u>Petition Date Exchange Rate</u>" means the value of BTC in Dollars as determined using the close price of BTC to Dollars exchange rate on May 8, 2023, as published by a recognized third-party source reasonably selected by the Borrower.

"<u>Requirement of Law</u>" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Shortfall</u>" shall have the meaning ascribed to such term in Section 3.1.4.

"<u>Subsidiary</u>" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50%

of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or, in the case of a limited liability company, more than 50% of the member interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.  Unless otherwise specified, "Subsidiary" means a Subsidiary of the Borrower; and references in this Agreement and the other Loan Documents to the Borrower and "its Subsidiary" or "any of its Subsidiaries" shall be deemed to be a reference to the Borrower and its Subsidiaries.

"Successor Cases" means a case or cases under chapter 7 of the Bankruptcy Code to which the Chapter 11 Cases may be converted or any other proceedings superseding the Chapter 11 Cases.

"Taxes" shall have the meaning ascribed to such term in Section 4.1(a).

"United States" or "U.S." means the United States of America, its fifty States and the District of Columbia.

"U.S. Trustee" means the office of the United States Trustee for the Southern District of New York.

Section 1.2    Use of Defined Terms.

Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and in each notice and other communication delivered from time to time in connection with this Agreement or any other Loan Document.

Section 1.3    Cross-References.

Unless otherwise specified, references in this Agreement and in each other Loan Document to any Article or Section are references to such Article or Section of this Agreement or such other Loan Document, as the case may be, and, unless otherwise specified, references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

## ARTICLE II

## COMMITMENT, BORROWING PROCEDURES, AND NOTES

Section 2.1    Commitment.

Subject to the terms and conditions of this Agreement and the Financing Orders, during the period commencing on the Closing Date and ending upon the Maturity Date, the Lender agrees from time to time to make loans ("**Advances**") to the Borrower from time to time, in amounts requested by the Borrower, up to an aggregate amount outstanding at any time not to exceed the Commitment Amount.

Section 2.2    Notes.

The Borrower agrees that, upon the request of the Lender, the Borrower will execute and deliver to the Lender a Note evidencing the Advances made by, and payable to the order of, the Lender in a maximum principal amount equal to the Commitment Amount.  The Borrower hereby irrevocably authorizes the Lender to make (or cause to be made) appropriate notations on the grid attached to the Note (or on any continuation of such grid), which notations, if made, shall evidence, *inter alia*, the date of and the outstanding principal amount of the Advances and the applicable interest rate.  Such notations shall be prima facie evidence of the existence and amounts of the obligations so recorded; provided, however, that the failure of the Lender to make any such notations or any error in such notations shall not limit or otherwise affect any Obligations of the Borrower.

Section 2.3    Borrowing Procedures.

Each Borrowing shall be made by a written request by an Authorized Person delivered to the Lender.  Such notice must be received by the Lender no later than 10:00 a.m. (New York time) on the Business Day that is at least one (1) Business Day prior to the requested Funding Date, specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day.  Subject to the terms and conditions of this Agreement, the Borrowing shall be made on the Business Day specified in such Borrowing Request.  On or before 11:00 a.m. (New York time) on the Business Day specified in such Borrowing Request, Lender shall make such funds available to the Borrower (i) by wire transfer to the accounts, or (ii) by paying such funds to the payees specified by, the Borrower shall have specified in its Borrowing Request.

Section 2.4    Use of Proceeds.

Subject to the Financing Orders, the proceeds of the Advances shall be used to pay wind down and working capital expenses, other general corporate purposes, and any other amounts set forth in the Budget.

Section 2.5    Superpriority Nature of Obligations.

Subject to the terms of the Financing Orders, all Obligations shall constitute joint and several allowed superpriority administrative expense claims against the Borrower (the "**DIP Superpriority Claims**") with priority in right of payment over any and all administrative expenses in the Chapter 11 Cases, in any successor case under chapter 11 of the Bankruptcy Code and in any case with respect to the Borrower converted to chapter 7 of the Bankruptcy Code, adequate protection claims, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code; *provided*, *however*, that the DIP Superpriority Claims shall be subject to the Carve-Out.  In no event shall the Carve-Out, or the funding of the Loan to satisfy the Carve-Out, result in any

- 7 -

reduction in the amount of the Obligations.  In addition to all rights of indemnity and subrogation any Borrower may have under applicable law, each entity constituting a Borrower agrees that in the event such Borrower is the initial obligor of an Obligation (the "**Obligor Borrower**"), for which a payment is made by another entity constituting a Borrower (the "**Paying Borrower**"), the Obligor Borrower shall indemnify the Paying Borrowing for the full amount of such payment (in all cases after payment of the Obligations to Lender in full), and the Paying Borrower shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment (in all cases after payment of the Obligations to Lender in full).

## ARTICLE III

## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

Section 3.1     Repayments and Prepayments.

Section 3.1.1.    The Borrower shall repay, in accordance with Section 3.1.4, the unpaid principal amount of the Loan on the Maturity Date.

Section 3.1.2.    Amounts repaid or prepaid on account of the Loan may not be reborrowed.

Section 3.1.3.    Prior to the Maturity Date, prepayments of the Loans may be made at any time without premium or penalty.

Section 3.1.4.    Notwithstanding anything to the contrary, any principal amount of the Loan (the "**Loan Principal Amount**") shall be paid in BTC.  If on the date of repayment of the Loan Principal Amount the Borrower has an insufficient number of BTC to pay the Loan Principal Amount in full, the Borrower shall purchase BTC to pay the amount of such shortfall (the "**Shortfall**"), provided that payment of the Shortfall shall be no greater than the Cap Amount, and such payment shall be deemed payment in full of the Loan Principal Amount.  All other Obligations that are not the Loan Principal Amount shall be paid by the Borrower at the Current Exchange Rate, any of which payment may, at the Borrower's option, be paid in BTC, Dollars, or any combination thereof.

Section 3.2     Interest Provisions.

Interest on the outstanding principal amount of the Loan shall accrue and be payable in accordance with Section 3.3 and Section 3.5.

Section 3.3     Rates.

Subject to Section 3.4 and Section 3.7, the Loan shall accrue interest at a rate per annum equal to four percent (4.00%), compounding monthly.

Section 3.4     Default Rate.

Upon the occurrence and during the continuance of an Event of Default, including, without limitation, after the date any principal amount of the Loan is due and payable (whether on the

Maturity Date, upon acceleration or otherwise), or after any other monetary Obligation of the Borrower shall have become due and payable, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment thereon) on all Obligations hereunder at a rate per annum equal to the rate of interest that otherwise would be applicable to the Loans plus a margin of one percent (1.00%). All such interest shall be payable on demand of the Lender.

Section 3.5    Payment Dates.

Interest accrued on the Loan shall be payable, without duplication: (a) on the Maturity Date; (b) on the date of any payment or prepayment, in whole or in part, of principal outstanding on the Loan; and (c) on any portion of the Loan which is accelerated pursuant to Section 8.2, immediately upon such acceleration. Interest accrued on the Loan or other monetary Obligations arising under this Agreement or any other Loan Document after the date such amount is due and payable (whether on the Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

Section 3.6    Application of Payments and Proceeds.

All payments received from the Borrower, and all amounts received as a result of the exercise of remedies under the Loan Documents or under applicable law, shall be applied upon receipt to the Obligations as follows: (i) first, to the ratable payment of all interest and fees owing under the Loan Documents and all costs and expenses owing to the Lender pursuant to the terms of the Loan Documents, until paid in full, in accordance with Section 3.1.4; (ii) second, after payment in full, in accordance with Section 3.1.4, of the amounts specified in clause (i), to the ratable payment of the principal amount of the Loan then outstanding, in accordance with Section 3.1.4; (iii) third, after payment, in accordance with Section 3.1.4, of the amounts specified in clauses (i) and (ii), to the ratable payment of all other Obligations owing to the Lender, in accordance with Section 3.1.4; and (iv) fourth, after payment of the amounts specified in clauses (i) through (iii), in accordance with Section 3.1.4, any excess to the Borrower or as otherwise directed by the Bankruptcy Court.

Section 3.7    Maximum Lawful Rate of Interest.

Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the Lender would be contrary to the provisions of any law applicable to the Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by the Lender, and in such event the Borrower shall pay the Lender interest at the highest rate permitted by applicable law (the "**Maximum Lawful Rate**"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lender, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

ARTICLE IV

TAXES AND PAYMENTS

Section 4.1    <u>Taxes.</u>

(a)    Except as set forth in the next sentence, all payments by the Borrower of principal of, and interest on, the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, sales, goods and services, value added or stamp taxes and other taxes, fees, duties, levies, withholdings or other charges of any nature whatsoever levied or imposed with respect to such payments by the United States (or any taxing authority or political subdivision thereof) and by any other jurisdiction as a result of a connection between the Borrower and such jurisdiction ("**<u>Taxes</u>**").  In the event that any withholding or deduction from any payment to be made by the Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then the Borrower shall:

(i)    pay directly to the relevant authority the full amount required to be so withheld or deducted;

(ii)    promptly forward to the Lender an official receipt or other documentation reasonably satisfactory to the Lender evidencing such payment to such authority; and

(iii)    if such Taxes are Indemnified Taxes, pay to the Lender for its account, such additional amount or amounts as necessary to ensure that the net amount actually received by the Lender will equal the full amount such Lender would have received had no such withholding or deduction been required.

In addition, the Borrower shall pay any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment being or being required to be made hereunder or under any Note or from the execution, delivery, registration, recording or enforcement of this Agreement or any Loans Document ("**<u>Other Taxes</u>**") imposed to the relevant authority imposing such Other Taxes in accordance with applicable law.

The Borrower shall indemnify the Lender for any Indemnified Taxes levied, imposed or assessed on (and whether or not paid directly by) the Lender (and whether or not such Taxes or Other Taxes are correctly or legally asserted by the relevant authority).  Promptly upon having knowledge that any such Indemnified Taxes have been levied, imposed or assessed, and promptly upon notice thereof by the Lender to the Borrower, the Borrower shall pay such Indemnified Taxes directly to the relevant authority (<u>provided</u>, <u>however</u>, that the Lender shall not be under any obligation to provide any such notice to the Borrower).  With respect to indemnification for Indemnified Taxes actually paid by the Lender (and for purposes of this Section 4.1 and the rights of the Lender hereunder, a distribution by the Lender to or for the account of the Lender shall be deemed a payment by or on behalf of the Borrower), such indemnification shall be made promptly by the Borrower (including any penalties, interest or expenses with respect to such Indemnified Taxes together with interest on such Indemnified Taxes at a rate per annum equal to the highest

- 10 -

rate per annum then in effect pursuant to Section 3.3 for the period from the date the Lender paid such Indemnified Taxes through the date of reimbursement by the Borrower) as is necessary in order that the total net amount received by the Lender after the payment of such Indemnified Taxes (and any Taxes imposed on such additional amount) shall equal the amount the Lender would have received had no the Indemnified Taxes been asserted.

If the Borrower fails to pay any Indemnified Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall, jointly but not severally, indemnify Lender, for any incremental Indemnified Taxes, interest or penalties that may become payable by the Lender, as a result of any such failure.

(b)     The Lender shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit payments hereunder to be made without withholding or at a reduced rate of withholding and such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not the Lender is subject to backup withholding or information reporting requirements.

(c)     The agreements in this Section 4.1 shall survive the termination of this Agreement and the payment of all amounts payable hereunder.

Section 4.2     <u>Payments, Computations, etc.</u>

Unless otherwise expressly provided, all payments by the Borrower pursuant to this Agreement or any other Loan Document shall be made by the Borrower to the Lender.  All such payments required to be made to the Lender shall be made, without setoff, deduction or counterclaim, not later than 2 p.m., New York City time, on the date due, by wire transfer in same day or immediately available funds, to such account as the Lender shall specify from time to time by notice to the Borrower.  Funds received after that time shall be deemed to have been received by the Lender on the next succeeding Business Day.  All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Whenever any payment to be made shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees, if any, in connection with such payment.

ARTICLE V

CONDITIONS TO THE BORROWINGS

Section 5.1     <u>Conditions to the Borrowings Under Interim Order</u>.

The obligations of the Lender to make any initial Advances hereunder at any time prior to entry of the Final Order shall be subject to the prior or concurrent satisfaction of the following:

Section 5.1.1.     <u>Interim Order</u>.  The Interim Order shall have been entered by the Bankruptcy Court, within ten (10) Business Days after the Petition Date, which Interim

Order shall be in form and substance satisfactory to the Lender and shall have been entered on such prior notice to such parties in accordance with Bankruptcy Rule 4001, and the Lender shall have received a copy of same, and such order shall be in full force and effect and shall not have been (i) stayed, vacated, revised or rescinded or (ii) without the prior written consent of the Lender, in its sole discretion, amended or modified.

Section 5.1.2.    <u>Final Documentation</u>.  The Borrower shall have executed and delivered to the Lender (or shall have caused to be executed and delivered to the Lender by the appropriate Person) this Agreement and the Notes evidencing, among other things, the Loan and the Obligations hereunder.

Section 5.1.3.    <u>Representations and Warranties; No Default</u>.  Both before and after giving effect to the Borrowing of the Loan, (i) each of the representations and warranties set forth in <u>ARTICLE VI</u> hereof shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth in such representation or warranty), except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth in such representation or warranty) as of such earlier date and (ii) there shall exist no Default or Event of Default.

Section 5.1.4.    <u>Notice of Borrowing</u>.  The Lender shall have received a Notice of Borrowing meeting the requirements of Section 2.3, not to exceed the amounts authorized in the Interim Order.

Section 5.2    <u>Conditions Precedent to Borrowings Under Final Order</u>.

The obligation of the Lender to make Loans is subject, at the time of the making of each such Loan, to the satisfaction of the following conditions:

Section 5.2.1.    <u>Final Order</u>.  The Final Order shall have been entered by the Bankruptcy Court, within thirty (30) days after the Petition Date, which Final Order shall be in form and substance satisfactory to the Lender and shall have been entered on such prior notice to such parties in accordance with Bankruptcy Rule 4001, and the Lender shall have received a copy of same, and such order shall be in full force and effect and shall not have been (i) stayed, vacated, revised or rescinded or (ii) without the prior written consent of the Lender, in its sole discretion, amended or modified.

Section 5.2.2.    <u>Representations and Warranties; No Default</u>.  At the time of each making of Loans and also after giving effect thereto, (i) each of the representations and warranties made by the Borrower contained herein or in the other Loan Documents shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth in such representation or warranty), in each case on and as of such date as if made on and as of such date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (without giving effect to any limitation as to

"materiality" or "Material Adverse Effect" set forth in such representation or warranty) as of such earlier date and (ii) there shall exist no Default or Event of Default.

Section 5.2.3.   Notice of Borrowing.  The Lender shall have received a Notice of Borrowing meeting the requirements of Section 2.3, not to exceed the amounts authorized in the Final Order.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower represents and warrants to the Lender as set forth in this ARTICLE VI.

Section 6.1   Corporate Existence and Power.  The Borrower:

(a)   is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization; and

(b)   has the power and authority and all governmental licenses, authorizations, permits, consents and approvals to own its assets and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party.

Section 6.2   Authorization.

Subject to the Financing Orders, the execution, delivery and performance by the Borrower of this Agreement and any other Loan Document has been duly authorized by all necessary action, and do not and will not contravene the terms of any of the Borrower's organizational documents.

Section 6.3   Governmental Authorization.

Subject to the entry of the Financing Orders, no approval, consent, exemption, authorization, or other action, by or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document, except where the failure to do so, individually or in the aggregate, would not have a Material Adverse Effect.

Section 6.4   Binding Effect.

Upon the entry by the Bankruptcy Court of the Interim Order, this Agreement and each other Loan Document to which the Borrower is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by the Bankruptcy Code, the Bankruptcy Court and/or by equitable principles regardless of whether considered in a proceeding in equity or at law.

ARTICLE VII

COVENANTS

Section 7.1      Affirmative Covenants.

Until the date on which all Obligations have been paid, in accordance with Section 3.1.4, the Borrower covenants and agrees that the Borrower will perform the obligations set forth in this Section 7.1.

Section 7.1.1.    Financial Information, Reports, Notices, etc.    The Borrower shall deliver (or cause to be delivered) to the Lender copies of all pleadings, motions, applications, financial information and other papers and documents with respect to this Agreement filed by the Borrower in the Chapter 11 Cases or submitted to the U.S. Trustee or the Committee at the same time as such reports are filed with the Bankruptcy Court or submitted to the U.S. Trustee or the Committee, as applicable.

Section 7.1.2.    Notices.

(a)      The Borrower shall promptly give written notice to the Lender of the occurrence of any Default or Event of Default, accompanied by the details of such Default or Event of Default and stating the actions the Borrower proposed to take with respect thereto; and

(b)      The Borrower shall keep the Lender apprised of any event or condition which is reasonably likely to have a material adverse effect on the Chapter 11 Cases.

Section 7.1.3.    Use of Proceeds/Reporting.  The Borrower shall apply the proceeds of the Loan in accordance with Section 2.4 hereof.  On the fourth Business Day of each calendar month from and after the initial advance of the Loan, the Borrower shall deliver to the Lender, in a form reasonably acceptable to the Lender, a monthly variance report showing all receipts and disbursements of the Borrower during the prior month and on a cumulative basis for the Chapter 11 Cases, along with any variances on a line item basis against the Budget.

Section 7.1.4.    Further Assurances.    Without expense or cost to the Lender, the Borrower shall from time to time hereafter execute, acknowledge, file, record, do and deliver all and any further documents and other instruments as the Lender may from time to time reasonably request in order to carry out more effectively the purposes of this Agreement, the other Loan Documents, and the Financing Orders, and to assure, convey, assign, transfer and confirm unto the Lender the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that the Borrower may be or may hereafter become bound to convey or to assign to the Lender or for carrying out the intention of or facilitating the performance of the terms of this Agreement, any other Loan Documents, the Financing Orders, including registering or recording this Agreement or any other Loan Document.

Section 7.1.5.    Compliance with Financing Orders.    Comply with the Interim Order and the Final Order, as applicable.

Section 7.2     Negative Covenants.

Until the date on which all Obligations have been paid, in accordance with Section 3.1.4, the Borrower covenants and agrees that the Borrower will perform the obligations set forth in this Section 7.2.

Section 7.2.1.    Chapter 11 Claims.  Without the prior written consent of the Lender, the Borrower will not incur, create, assume, suffer to exist or permit any Lien that did not exist prior to the Petition Date, administrative expense, unsecured claim or other superpriority claim which is *pari passu* with or senior to the DIP Superpriority Claim granted hereunder, or apply to the Bankruptcy Court for authority to do so.

Section 7.2.2.    Revision of the Financing Orders; Applications to Bankruptcy Court.

(a)    The Borrower will not consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order, except for any modifications and amendments agreed to in writing by the Lender.

(b)    The Borrower will not apply to the Bankruptcy Court for authority to take any action prohibited by this Section 7.2 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Lender).

# ARTICLE VIII

# EVENTS OF DEFAULT

Section 8.1     Event of Default.

The occurrence of any one or more of the following events, regardless of the reason therefore, shall constitute an "**Event of Default**" hereunder:

Section 8.1.1.    failure by the Borrower to pay, as required to be paid under any Loan Document, (i) any amount of principal of any Loan when the same shall become due and payable hereunder, whether on the Maturity Date or otherwise, (ii) any interest on any Loan payable under any Loan Document, when the same shall become due and payable under any Loan Document, and such failure (in the case of this clause (i) or (ii)) shall continue unremedied for a period of ten (10) Business Days;

Section 8.1.2.    failure by the Borrower to comply with any term of this Agreement or the Financing Orders, and such failure shall continue unremedied for a period of ten (10) Business Days after the Lender provides the Borrower written notice thereof;

Section 8.1.3.    failure to obtain entry of the Interim Order within ten (10) Business Days after the Petition Date or the Final Order within thirty (30) days after the Petition Date;

Section 8.1.4.    the occurrence of a Material Adverse Effect;

Section 8.1.5.    the appointment of a trustee or an examiner for any Borrower with expanded powers under section 1104(c) of the Bankruptcy Code of the Chapter 11 Cases;

Section 8.1.6.    entry of any order of the Bankruptcy Court dismissing any of the Chapter 11 Cases;

Section 8.1.7.    conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code

Section 8.1.8.    any challenge or objection by the Borrower as to the extent, amount, validity, priority, enforceability or non-avoidability of the DIP Superpriority Claim;

Section 8.1.9.    any portion of the Carve-Out is utilized outside of the Budget or to prosecute actions, claims, demands, or causes of action against the Lender or to object to or contest in any manner or to raise any defense in any pleading to the entry of the Financing Orders, the validity, perfection, priority, or enforceability of this Agreement, or the rights and claims granted to the Lender under this Agreement or the Financing Orders;

Section 8.1.10.    the entry of an order amending, modifying, staying, revoking or reversing the Financing Orders without the express written consent of the Lender;

Section 8.1.11.    the granting of any claim that is entitled to any security interest in the Borrower's assets or *pari passu* with or senior to the DIP Superpriority Claim without the Lender's written consent; or

Section 8.1.12.    any representation, warranty or certification by or on behalf of the Borrower made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or other written statement delivered or required to be delivered pursuant hereto shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made, provided that if such breach is capable of being cured, then such breach will not constitute an Event of Default hereunder unless such breach remains unremedied for thirty (30) Business Days after the Lender provides the Borrower written notice thereof.

Section 8.2    Action Upon the Occurrence of an Event of Default.

Section 8.2.1.    Upon the occurrence and during the continuance of any Event of Default, the Lender may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Borrower, subject to the Financing Orders, declare (i) the unpaid principal amount of and accrued interest on the Loans and (ii) all other Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower, and the same shall forthwith become immediately due and payable, and the obligation of the Lender to make any Loans, and the Commitment, shall thereupon terminate.

Section 8.2.2.    Upon the occurrence and during the continuance of any Event of Default, the Lender may, subject to the Financing Orders, exercise all rights and remedies of the Lender forth in any of the Loan Documents, in addition to all rights and remedies allowed by the United States and any state thereof.

ARTICLE IX

MISCELLANEOUS PROVISIONS

Section 9.1    Waivers, Amendments, etc.

Section 9.1.1.    Unless otherwise expressly provided in this Agreement, no amendment or modification of any provision of this Agreement or any of the other Loan Documents shall be effective, and no waiver of any provision of this Agreement or of any of the other Loan Documents, or consent to any departure by the Borrower therefrom, shall be effective unless such amendment, waiver or consent is in writing signed by the Lender, in the case of an amendment, signed by the Borrower.  No failure or delay on the part of the Lender in exercising any power or right under this Agreement or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or consent by the Lender under this Agreement or under any other Loan Document shall, except as may be otherwise stated in such waiver or consent, be applicable to subsequent transactions.  No waiver or consent hereunder shall require any similar or dissimilar waiver or consent thereafter to be granted hereunder.

Section 9.1.2.    Notices.  All notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or electronic transmission, including e-mail, and addressed, delivered or transmitted to such party at its address or e-mail address set forth below or at such other address or e-mail address as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by e-mail shall be deemed given when transmitted.  Any notice under Section 7.1.2 hereof must be given by e-mail (or other electronic transmission) in addition to any other method of notice selected as specified herein.

If to the Borrower:

Bittrex, Inc.
701 5th Avenue, Suite 4200
Seattle, WA 98104
Attn:  James Waschak
E-mail:  finance@bittrex.com

with a copy to:

Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Attn:  Patty Tomasco, Daniel Holzman
E-mail:  pattytomasco@quinnemanuel.com
                danielholzman@quinnemanuel.com

If to the Lender:

Aquila Holdings Inc.
701 5th Ave, Suite 4200
Seattle, WA 98104
Attn:  Richie Lai
E-mail:  richie@bittrex.com

with a copy to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Attn: Laura Davis Jones, Esq.
E-mail:  ljones@pszjlaw.com

Section 9.2      Survival.

The obligations of the Borrower under Section 4.1 and Section 9.2 shall in each case survive any termination of this Agreement, the payment in full of all Obligations and the termination of the Commitment.  The representations and warranties made by the Borrower in this Agreement and in each other Loan Document shall survive the execution and delivery of this Agreement and each such other Loan Document.

Section 9.3      Severability.

Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.4      Headings.

The various headings of this Agreement and of each other Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or such other Loan Document or any provisions hereof or thereof.

Section 9.5    Execution in Counterparts, *etc.*

This Agreement may be executed by the parties hereto in several counterparts (including facsimile or electronic counterparts), each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

Section 9.6    Governing Law; Entire Agreement.

THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE) WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  This Agreement and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

Section 9.7    Successors and Assigns.

This Agreement and the other Loan Documents, the DIP Superpriority Claim and all other rights, benefits and privileges created hereby or pursuant hereto or pursuant to any other Loan Documents shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the Lender, the Borrower, and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Borrower or with respect to the property of the respective estates of the Borrower) whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of the Chapter 11 Cases or any Successor Cases, and shall inure to the benefit of the Borrower, the Lender, and their respective successors and assigns; provided, however, that the Borrower may not assign or transfer its rights, benefits, obligations or duties hereunder without the prior written consent of the Lender.

Section 9.8    Joint and Several Obligations.

The agreements, representations, and obligations of each entity comprising Borrower under this Agreement are joint and several, subject to any indemnification and subrogation rights under applicable law or set forth in this Agreement that any entity comprising Borrower have against any other entity comprising Borrower (in all cases after payment of the Obligations to Lender in full).

Section 9.9    Assignment of Lender's Rights.

The Lender may assign all or any portion of its rights and obligations under this Agreement (x) to any of its Affiliates or (y) to any other Person (other than a natural person, the Borrower, any Affiliate of the Borrower or any other Person taking direction from, or working in concert with, the Borrower or the Borrower's Affiliates), each of which assignees shall become a party to this Agreement as a Lender by execution of assignment documentation delivered to the Borrower.

Section 9.10   <u>Forum Selection and Consent to Jurisdiction</u>.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE LENDER OR THE BORROWER SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE OR, IF SUCH COURT DENIES JURISDICTION, THEN IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREE TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION. THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH ANY OF THEM MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 9.11   <u>Waiver of Jury Trial</u>.

EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE LENDER OR THE BORROWER. THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH EACH IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THIS AGREEMENT AND EACH SUCH OTHER LOAN DOCUMENT.

Section 9.12    <u>Reimbursement of Costs and Expenses</u>.

Upon the Maturity Date or earlier acceleration of the Obligations, the Borrower shall pay to the Lender promptly upon receipt of an invoice or accounting all of the Lender's reasonable costs and expenses, including without limitation, due diligence, transportation, computer, duplication, appraisal, audit (including per diems), insurance, consultant, search, filing and recording fees, and all other reasonable out-of-pocket expenses incurred by the Lender (including the reasonable fees and expenses of counsel, financial advisors, and other professionals and advisors) and all reasonable expenses of the Lender in connection with the negotiation, administration, monitoring, and enforcement of the Loan Documents.

Section 9.13    <u>Indemnity</u>.

In addition to the payment of expenses pursuant to Section 9.12, the Borrower shall jointly and severally indemnify, defend and hold harmless the Lender and each of its partners, members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (the "**Indemnitees**") from and against any of the following (collectively, the "**Indemnified Liabilities**"):

Any and all liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel, financial advisors and other professional and advisors) in connection with any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to, arising out of, by reason of or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with the making of Advances and the Loan Documents, the use or intended use of the Proceeds of the Advances and the other transactions contemplated hereby or thereby or the Chapter 11 Cases.

Notwithstanding the foregoing, the Borrower shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee, as finally determined by a court of competent jurisdiction.

*[Signature Pages Follow]*

- 21 -

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

<u>**LENDER:**</u>

**AQUILA HOLDINGS INC.**


By:    _____
       Name:
       Title:

**BORROWER:**

**BITTREX, INC.**


By: _____
       Name:
       Title:


**DESOLATION HOLDINGS LLC**


By: _____
       Name:
       Title:


**BITTREX MALTA HOLDINGS LTD.**


By: _____
       Name:
       Title:


**BITTREX MALTA LTD.**


By: _____
       Name:
       Title:

**EXHIBIT A**

**[FORM OF BORROWING REQUEST]**

**BORROWING REQUEST**

_____ __, 2023

Aquila Holdings Inc.
as the Lender under the below-referenced Credit Agreement
701 5th Ave, Suite 4200, Seattle, WA 98104
Attention:  Richie Lai
Telecopy No. (206) 413-8559

Ladies and Gentlemen:

Reference is made to that certain Superpriority Debtor-in-Possession Credit Agreement, dated as of [May 8], 2023 (the "Credit Agreement"), entered into by and among Bittrex, Inc., ("Bittrex"), Bittrex Malta Holdings Ltd. ("Malta Holdings"), Bittrex Malta Ltd. ("Malta Opco"), and Desolation Holdings LLC, each as debtor and debtor-in-possession ("Desolation" and together with Bittrex, Malta Holdings, and Malta Opco, individually, collectively and in all combinations, the "Borrower"), and Aquila Holdings Inc. (together with its respective successors and assigns, the "Lender").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

The Borrower hereby gives you notice pursuant to Section 2.3 of the Credit Amendment that the undersigned hereby requests a Loan under the Credit Agreement (the "Requested Borrowing"), and in that connection sets forth below the information relating to the Requested Borrowing.

The aggregate principal amount of the Requested Borrowing is _____ BTC.

The proceeds of the Requested Borrowing will be used for the Borrower's lawful and permitted purposes, consistent with the terms and conditions of the Credit Agreement.

The undersigned hereby irrevocably requests that the Requested Borrowing be made on _____ __, 2023, (the "Borrowing Date").

The respective proceeds of the Requested Borrowing should be remitted by wire transfer to the following account:

[Customers Bank
40 General Warren Blvd, Suite 200
Malvern, PA 19355
ABA/Routing No. 031302971]

The undersigned hereby certifies that:

(a)     both before and after giving effect to the Requested Borrowing, (i) each of the representations and warranties made by the Borrower contained in the Credit Agreement and in the other Loan Documents are true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth in such representation or warranty), in each case on and as of such date as if made on and as of such date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties are true and correct in all material respects (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth in such representation or warranty) as of such earlier date and (ii) no Default or Event of Default exists; and

(b)     the other conditions set forth in the Credit Agreement applicable to the Requested Borrowing have been satisfied.

Very truly yours,

**[Bittrex, Inc.] / [Bittrex Malta Holdings Ltd.] / [Bittrex Malta Ltd.] / [Desolation Holdings LLC]**

By:     _____
         Name:
         Title:

**<u>EXHIBIT B</u>**

**<u>FORM OF FINANCING ORDERS</u>**

[ATTACHED]

# EXHIBIT C
# FORM OF NOTE
# [ATTACHED]

**[FORM OF PROMISSORY NOTE]**

**PROMISSORY NOTE**

[●] BTC

Seattle, Washington

_____ __, 202_

FOR VALUE RECEIVED, [BITTREX, INC.] / [BITTREX MALTA HOLDINGS LTD.] / [BITTREX MALTA LTD.] / [DESOLATION HOLDINGS LLC], as debtor and debtor in possession under Chapter 11 of title 11 of the United States Code (or any Successor Case together with its successors and assigns, the "Borrower"), hereby unconditionally promises to pay to the order of Aquila Holdings Inc. (together with their respective successors and assigns, the "Lender"), the aggregate unpaid principal amount of all obligations of the Borrower under the Credit Agreement referred to below on the Maturity Date (as defined therein) or on such earlier date as may be required by the terms of the Credit Agreement. The Borrower further promises to pay interest on the unpaid principal amount of each such Loan on the dates, at the rate and in the manner provided for in the Credit Agreement. All such payments of principal and interest shall be made in lawful money of the United States of America and in immediately available funds at the office specified from time to time by the Lender to the Administrative Borrower in accordance with the Credit Agreement, without set-off, defense or counterclaim.

This Promissory Note is one of the Notes referred to in the Superpriority Debtor-in-Possession Credit Agreement dated as of [May 8], 2023 (as the same has been and may be modified and supplemented and in effect from time to time, the "Credit Agreement"), and entered into by and between the Borrower and the Lender. Terms used but not otherwise defined herein have the respective meanings assigned to them in the Credit Agreement.

The Loan made in the aggregate principal amount of up to [_____] BTC by the Lender and all repayments of the principal thereof, shall be recorded by the Lender and, prior to any transfer hereof, appropriate notations to evidence the foregoing information with respect to the Loan then outstanding shall be endorsed by the Lender on the schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof, or in the Lender's own books and records, provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrower hereunder or under the Credit Agreement or any other Loan Document. Absent manifest error, such notations shall be binding and conclusive upon the Borrower.

Reference is made to the Credit Agreement for provisions for the repayment and prepayment, the acceleration of the maturity and the limitations on the transferability of this Promissory Note.

Demand, presentment, protest and notice of nonpayment and protest or notice of any kind are hereby waived by the Borrower.

Whenever in this Promissory Note reference is made to the Lender or the Borrower, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns. The provisions of this Promissory Note shall be binding upon and shall inure

to the benefit of said successors and assigns.  A Borrower's successors and assigns shall include, without limitation, a receiver or a trustee of or for that Borrower.

Failure or delay of the holder of this Promissory Note to enforce any provision of this Promissory Note shall not be deemed a waiver of any such provision, nor shall the holder of this Promissory Note be estopped from enforcing any such provision at a later time.  Any waiver of any provision hereof must be in writing and signed by the holder of this Promissory Note.

Notwithstanding anything else in this Promissory Note to the contrary, the right to the principal of, and interest on, this Promissory Note may be transferred only in accordance with the terms and conditions set forth in the Credit Agreement and only if the transfer is registered in a register maintained by the Lender on which it enters the name and address of each Lender as the registered owner of the Obligations and Commitments (and the principal amount thereof and stated interest thereon) held by such Lender.

This Promissory Note shall be governed by, and construed in accordance with, the law of the State of New York.

For the avoidance of doubt, whether or not explicitly set forth in any particular provision of this Promissory Note, each undertaking, covenant and agreement of a Borrower under this Promissory Note shall be binding on, and shall be deemed an undertaking, covenant and agreement of, any trustee appointed under the Bankruptcy Code on behalf of the Borrower to the same extent as if references herein to the Borrower were references to such trustee acting on behalf of the Borrower.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

      IN WITNESS WHEREOF, each Borrower has caused this Promissory Note to be executed as of the day and year first written above.

[BITTREX, INC.

By: _____
     Name:
     Title:  ]

[DESOLATION HOLDINGS LLC

By: _____
     Name:
     Title:  ]

[BITTREX MALTA HOLDINGS LTD.]

By: _____
     Name:
     Title:  ]

[BITTREX MALTA LTD.]

By: _____
     Name:
     Title:  ]

## **<u>SCHEDULE 1</u>**

## **<u>AUTHORIZED PERSONS</u>**

The following names are Authorized Persons on behalf of Borrower:

Name:  Chris Chenoweth
Email:  lending@bittrex.com
Name:  James Waschak
Email:  jim@bittrex.com

Borrower may change any of its Authorized Persons by written notice given to Lender as provided herein.