## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Bittrex, Inc.,[1] | ) Case No. 23-10598 (BLS) |
| | ) |
| | ) (Jointly Administered) |
| Wind Down Entity. | ) |
| | ) |
| | ) **Re: D.I. 411, 468, 470, 711** |

Donald J. Detweiler, Esquire
(DE Bar No. 3087)
**WOMBLE BOND DICKINSON (US) LLP**
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801

Kenneth Enos, Esquire
(DE Bar No. 4544)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 North King Street
Wilmington, Delaware 19801

M. Rhett DeHart, Esquire
(admitted *pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
5 Exchange Street
Charleston, South Carolina 29401

Patricia B. Tomasco, Esquire
(admitted *pro hac vice*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Counsel to Azim Ghader*

*Counsel for the Plan Administrator*

### OPINION[2]

This matter came before the Court for trial upon the Debtors' *Objection to Claims Filed by Azim Ghader* (the "Claim Objection").[3] The Debtors and Azim Ghader have entered into a Stipulation Regarding Withdrawal of Claims (the "Claims Stipulation"),[4] which has

---

[1] The Debtors in these post-confirmation Chapter 11 cases are Desolation Holdings LLC, Bittrex, Inc., Bittrex Malta Holdings Ltd., and Bittrex Malta Ltd.

[2] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Mr. Ghader, the Debtors and the Plan Administrator (collectively, the "Parties") have each confirmed their consent, pursuant to Rule 9013-1(f) of this Court, to the entry of a final order by the Court in connection with this Claim Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

[3] D.I. 411.

[4] D.I. 468.

narrowed his claims to four remaining claims (collectively, the "Surviving Claims").[5] By the Surviving Claims, Mr. Ghader seeks recovery for lost profits and damages he alleges he suffered when his cryptocurrency on the Bittrex exchange was frozen by the Debtors in 2017. As discussed more fully below, the Debtors contend that Mr. Ghader has waived any right to damages or other recovery by agreeing to the Terms of Service that governed use of their cryptocurrency exchange.

For the reasons that follow, the Court will sustain the Claim Objection, and grant the relief requested therein. Specifically, the Court will allow Claim 600-96 in the amount of 728,217.96089 HempCoin (THC), 13,782,397.10790 ReddCoin (RDD), 1,970.62728 Particl (PART), and 6,485.57100 TenX Pay Token (PAY) against Malta OpCo, and disallow the remainder of the Surviving Claims. The record at trial, as described more fully below, indicates that the cash value of Mr. Ghader's allowed claim in this Chapter 11 case is approximately $4,000.

## BACKGROUND

### A.  The Debtors' Chapter 11 Cases and Plan

On May 8, 2023 (the "Petition Date"), each of the Debtors filed voluntary Petitions for relief under chapter 11 of the Bankruptcy Code. Shortly thereafter, the Debtors filed their Bar Date Motion,[6] setting August 31, 2023 as the general bar date for filing proofs of claim. The record reflects that the Debtors served notice of the bar date on all creditors.[7]

---

[5] The Surviving Claims are Claim Nos. 599-998, 598-1021, 600-87, and 600-96. Mr. Ghader's Withdrawn Claims (as defined in the Claims Stipulation) have been withdrawn and are no longer at issue and only Surviving Claims 598-998 and 598-1021 (against Bittrex, Inc. or "BUS") and Claims 600-87 and Claim 600-96 (against Bittrex Malta, Ltd. or "Malta OpCo") remain as the Surviving Claims. In his Surviving Claims, Mr. Ghader asserts claims for breach of contract, breach of implied covenant of good faith and fair dealing, negligence, conversion, misrepresentation and fraud.

[6] D.I. 65.

[7] D.I. 201.

On October 31, 2023, the Court entered its Order[8] confirming the Debtors' Amended Chapter 11 Plan of Liquidation (the "Plan").[9] Pursuant to the Plan, Class 2A claims are BUS Customer Claims, Class 2B claims are Malta OpCo Customer Claims, and Class 3 claims are GUC Claims.[10] The Plan provides that holders of allowed Class 2A and Class 2B customer claims will receive a "Customer Distribution"—defined in the Plan as "the Distribution of like-kind Cryptocurrencies to Holders of Customer Claims by providing access to the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies associated with such Customer's account as of the Petition Date[]"—subject to certain restrictions and provided that all government regulations applicable to the claimant are satisfied prior to making the distribution.[11] In simple terms, the Plan provides that customers can take back their cryptocurrency that is presently on the Debtors' exchange.[12]

The Debtors comprise four entities: Bittrex Inc. ("BUS"), Bittrex Malta Ltd. ("Malta OpCo"), Desolation Holdings LLC ("Desolation"), and Bittrex Malta Holdings Ltd. ("Malta Holdings"). Prior to commencing these Chapter 11 proceedings, BUS and its affiliates (collectively referred to hereinafter as the "Debtors") provided online cryptocurrency exchange services through their website platform.[13] BUS started in February 2014 with the incorporation of BUS' predecessor, Bittrex, LLC, in Nevada.[14] Malta OpCo is a Maltese private limited company that was created in 2018 and served non-U.S. customers until it ceased operations in 2019.[15]

---

[8] D.I. 517.

[9] D.I. 517-1.

[10] *See* Plan, Art. III.D.2-4.

[11] *See id.*, Art. III.D.2-3, Art. I.A.37.

[12] *See id.*, Art. III.D.4.

[13] 1/16/24 Tr., 70:5-6 (Maria testimony); Plan Administrator (hereinafter "PA") Ex. 48, 49.

[14] 1/16/24 Tr., 43:18, 20-22, 70:5-6 (Maria testimony); PA Ex. 48.

[15] Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions (the "First-Day Declaration"), D.I. 11 ¶¶ 1, 36-37.

Prior to commencing these Chapter 11 proceedings, the Debtors operated a cryptocurrency exchange (the "Exchange") that provided "an online platform for access to the [cryptocurrency] exchange to customers in different jurisdictions."[16] The record reflects that BUS was a money services business that was required to comply with regulations issued by the Financial Crimes Enforcement Network ("FinCEN"), Office of Foreign Assets Control ("OFAC"), and Securities and Exchange Commission ("SEC").[17]

### B. Dealings with Customers in Iran

In February 2016, the Debtors hired BlockScore, LLC, a third-party vendor, to screen customers and potential customers for compliance with various sanctions programs of the United States government.[18] The Debtors anticipated that BlockScore would provide comprehensive sanctions screening services and otherwise fulfill the Debtors' sanctions compliance obligations in onboarding new customers onto their Exchange.[19] These services were necessary because sanctions imposed by the United States government prohibited residents of specified countries— including Iran—from joining or utilizing the Exchange. However, the uncontroverted record reveals that BlockScore only verified that the Debtor's customers were not included by name on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC, but failed to otherwise screen customers for a nexus to sanctioned jurisdictions.[20] Consequently, residents of Iran and other sanctioned jurisdictions were improperly permitted to join the Exchange and traded on it until the fourth quarter of 2017.[21] It is undisputed that residents of Iran were not legally authorized to utilize the Exchange at that time, on account of pending sanctions.

---

[16] First-Day Declaration at ¶ 1.
[17] 1/16/24 Hearing Tr. 56:6-7 (Maria testimony); *see also* Ghader Ex. 12; Ghader Ex. 31 at 1.
[18] 1/16/24 Tr., 56:23-24, 112:11-12 (Maria testimony); PA Ex. 48, 49.
[19] 1/16/24 Tr., 57:1-8 (Maria testimony); PA Ex. 48, 49; Ghader Ex. 93.
[20] 1/16/24 Tr., 57:1-8, 57:11, 112:11-18 (Maria testimony); PA Ex. 48, 49; Ghader Ex. 93.
[21] 1/16/24 Tr., 128:5-7, 129:3-4, 17-20, 22-25; 130:1-3, 8 (Maria testimony); PA Ex. 48, 49.

On October 10, 2017, BUS received an administrative subpoena from OFAC (the "Subpoena") directing it to provide OFAC with information regarding BUS' relationship with any persons or entities located in Iran.[22] Immediately after receiving the Subpoena, BUS froze the accounts of all customers it identified as having ties to Iran and other sanctioned jurisdictions.[23] The freeze imposed by BUS meant that funds that had been placed on the Exchange by residents of Iran could not be accessed or recovered from the Exchange while OFAC was conducting the investigation it had commenced by the Subpoena.[24]

### C. Mr. Ghader's Bittrex Account Activity

Mr. Ghader is a cryptocurrency investor and trader. He is a dual citizen of Iran and Commonwealth of Dominica, and currently resides in Istanbul, Turkey. When BUS permitted Mr. Ghader to open an account on its Exchange in June of 2017, Mr. Ghader was living in Iran.[25] As noted above, BUS was prohibited by law from offering services at that time to Mr. Ghader, or any persons residing in Iran due to sanctions imposed by OFAC.[26] The Plan Administrator does not dispute that BUS violated the OFAC regulations by offering and providing services to Mr. Ghader in June of 2017.

On June 10, 2017, while a resident of Iran,[27] Mr. Ghader opened an account (the

---

[22] 1/16/24 Tr., 63:18–65:1 (Maria testimony); PA Ex. 48, 49.

[23] 1/16/24 Tr., 65:2-10, 115:4-7 (Maria testimony); PA Ex. 48, 49.

[24] After a five-year investigation relating to the transactions of customers from sanctioned jurisdictions, OFAC and BUS reached a settlement on October 10, 2022 (the "Settlement"). 1/16/24 Tr., 115:8–9 (Maria testimony); PA Ex. 48, 49. Pursuant to the Settlement, BUS agreed to pay approximately $24.28 million to the U.S. Department of Treasury for its violations of OFAC regulations. PA Ex. 48, 49. The Settlement recited OFAC's determination that BUS' violations were not knowing or willful because BUS was unaware that Blockscore was not screening for sanctioned jurisdictions. The Settlement further recites that "[o]nly after OFAC issued [BUS] a subpoena in October 2017 to investigate potential sanctions violations did [BUS] realize that the vendor was not scrutinizing whether customers were in a sanctioned jurisdiction." 1/16/24 Tr., 113:22–114:7 (Maria testimony); PA Ex. 48, 49.

[25] 1/17/24 Hearing Tr. 307:23–308:13 (Ghader testimony) (Mr. Ghader testified that he was a resident in Iran through 2018 before establishing residency in Turkey in 2019, except for five months in 2020 where he lived in Estonia. Mr. Ghader never claimed residency in Turkey in 2019, doing so only at trial and in his judicial admissions.).

[26] *See* First-Day Declaration ¶ 13.

[27] 1/17/24 Hearing Tr. 307:23–308:13 (Ghader testimony).

"Account") with BUS.[28] Mr. Ghader registered as a customer on BUS' website by (i) providing his email address (which became his username); and (ii) accepting BUS' terms of service (the "2015 Terms of Service").[29] Upon opening his Account with his email, creating a password and checking the box to consent to the 2015 Terms of Service, Mr. Ghader was able to immediately deposit and trade cryptocurrency.[30]

For his Account to be an "enhanced account"—allowing him to trade or withdraw larger amounts of cryptocurrency—Mr. Ghader voluntarily submitted to BUS's verification process and submitted a copy of his Iranian passport, Iranian phone number, and provided BUS with an address in Dubai.[31] Mr. Ghader explained at trial that he provided a mailing address in the United Arab Emirates so that he could receive mail from countries, such as the United States, from which delivery would otherwise be prohibited to an Iranian address due to existing sanctions.[32]

Mr. Ghader traded on the Exchange until October 11, 2017, at which time BUS disabled his Account because of its nexus to Iran.[33] Between June 10, 2017 and October 11, 2017, Mr. Ghader made 27 deposits into his Account, investing over $1,300,000 in Bitcoin and other cryptocurrency tokens.[34]

Immediately upon finding his Account disabled—which at that time held

---

[28] 1/18/24 Hearing Tr. 449:19-21 (Ghader testimony).

[29] 1/16/24 Tr., 46:8-15, 47:15-17, 47:20-23 (Maria testimony); 1/18/24 Tr., 498:9-11 (Ghader testimony); PA Ex. 40, 101; D.I. 470 ¶ 11. In his Response, Mr. Ghader unequivocally stated that he had agreed to the 2015 Terms of Service, and that these Terms apply to his case: "At the time that he opened the "Enhanced Account", Mr. Ghader agreed to BUS' 2015 version of its Terms and Services attached hereto as Exhibit B."

[30] 1/16/24 Tr., 60:4–62:15 (Maria testimony); 1/17/24 Tr., 357:19-22 (Ghader testimony); PA Ex. 102; 1/18/24 Hearing Tr. 454:11–455:16; 461:22–462:5 (Ghader testimony).

[31] 1/16/24 Tr., 48:12–49:3, 49:—9 (Maria testimony); 1/17/24 Tr., 337:9 (Ghader testimony); PA Ex. 29.

[32] 1/18/24 Hearing Tr. 477:25–478:25 (Ghader testimony) (Mr. Ghader also testified that BUS' verification process also requested an "address," but did not specifically ask for a residential address.).

[33] 1/16/24 Tr., 63:6-8, 65:2-4, 65:18-22, 65:24–66:1 (Maria testimony).

[34] 1/18/24 Hearing Tr. 465:19-24, 466:4-5 (Ghader testimony) (Mr. Ghader testified that he deposited approximately 299 bitcoins and 60,000 Ark coin during this period); *see id.* at 529:9-20 (Ghader testimony).

cryptocurrency assets with a value in excess of $1,000,000[35]—Mr. Ghader emailed BUS and requested that his Account be re-activated.[36] Mr. Ghader initially received an automatically-generated response that BUS used for any situations in which an account was locked.[37] On October 16, 2017, a BUS employee responded to Mr. Ghader's email and advised that his Account was under review.[38] Over the next few months, Mr. Ghader wrote regularly to BUS asking to reactivate his Account.[39] On January 7, 2018, a BUS employee stated to Mr. Ghader: "You indicated you reside in Dubai but provided an Iranian passport. Please provide proof of residency in Dubai, or if not Dubai, please indicate where you reside."[40] Mr. Ghader did not respond to BUS' request for proof of residency in Dubai.[41]

On June 27, 2018, Mr. Ghader started a chat conversation with a BUS employee, noting that he was trying to log in to his Account "after 5-6 months," but that his Account remained disabled.[42] That same day, BUS responded to Mr. Ghader and informed him as follows:

> We have concluded a compliance review of your account and regret to tell you that your account must remain suspended. **Federal economic sanctions law prohibits U.S. companies from engaging in economic transactions with the residents of certain countries, including Iran,** …. Our Terms of Service, which users agree to when they sign up, prohibits such individuals from signing up for our service. We have concluded that you are a resident of one of the four above-listed countries. Under federal law, this account must remain suspended, pending direction from the U.S. Office of Foreign Assets Control as to the appropriate action to be taken. **If you believe that we erroneously concluded that you are a resident of one of these**

---

[35] *See* supporting addenda to Surviving Claims.

[36] PA Ex. 14.

[37] 1/16/24 Tr., 68:3-8 (Maria testimony); PA Ex. 14. The stock message stated: "For security purposes, once your account is locked there will be a minimum 24 hour wait period before it will be unlocked . . . After a minimum of 24 hours has passed, we will check your ticket and enable your account. In some circumstances, we may require additional information."

[38] PA Ex. 14. At that time, BUS was evaluating the appropriate course of action to take in connection with the Subpoena. 1/16/24 Tr., 68:11-16 (Maria testimony).

[39] 1/16/24 Tr., 69:8-10 (Maria testimony); PA Ex. 14, 15.

[40] PA Ex. 15.

[41] 1/16/24 Tr., 75:19-22 (Maria testimony); 1/18/24 Tr., 391:20-22 (Ghader testimony); PA Ex. 15.

[42] 1/16/24 Tr., 76:17-22 (Maria testimony); PA Ex. 16.

**countries, please reply to this ticket and let us know**. Otherwise, we will keep you apprised of developments as we receive instructions from the U.S. Government.[43]

Mr. Ghader did not respond to BUS' communication relaying the suspension of his Account due to OFAC sanctions.[44]

The Debtor's records and IP logs show that on November 20, 2018, Mr. Ghader went to the BUS website and, because he was logging on from outside of the United States and via VPN (such that his IP address did not reflect a location in Iran), he was diverted to the Bittrex International website,[45] and prompted to accept the 2018 Terms of Service.[46] Pursuant to the Debtor's IP logs, Mr. Ghader accepted the 2018 Terms of Service and continued to log into his Account.[47] Ultimately, Mr. Ghader could not execute any transactions in his Account, which remained restricted under the U.S. sanctions.[48]

On December 10, 2018, Mr. Ghader again asked BUS to reactivate his Account.[49] BUS promptly responded and repeated to Mr. Ghader that his Account would remain suspended because "[f]ederal economic sanctions law prohibits U.S. companies from engaging in economic transactions with the residents of certain countries, including Iran."[50] BUS asked Mr. Ghader to

---

[43] 1/16/24 Tr., 76:23–77:8 (Maria testimony); PA Ex. 16 (emphasis added).

[44] 1/16/24 Tr., 77:11-12 (Maria testimony); 1/18/24 Tr., 395:6 (Ghader testimony); PA Ex. 16.

[45] In October 2018, the Debtors decided to separate its U.S.-based customers from its international customers. This separation did not entail any transfer of assets between the four Debtor entities because the Debtors kept all the assets associated with customer accounts in omnibus wallets. The evidence at trial indicated that, due to this separation, an international customer logging in from a non-sanctioned foreign jurisdiction would be automatically diverted to the logon screen of "Bittrex International" and would be asked to accept the related terms of services (the "2018 Terms of Service"); 1/16/24 Tr., 78:10-13, 79:2-4, 80:9-22 (Maria testimony).

[46] 1/16/24 Hearing Tr. 78:14-25 (Maria testimony); *see* PA Ex. 27.

[47] 1/16/24 Hearing Tr. 78:25–79:16 (Maria testimony); *see* PA Ex. 27. In contrast, Mr. Ghader testified that he never accepted the 2018 Terms of Service and has no recollection of seeing the 2018 Terms of Service.

[48] 1/16/24 Tr., 79:4-7 (Maria testimony).

[49] PA Ex. 17.

[50] *Id.*

reply to the ticket if he believed that BUS had erroneously concluded that he resided in a

sanctioned country.[51] Mr. Ghader did not respond.[52]

On March 26, 2019, Mr. Ghader once again contacted BUS, asking to "activate [his]

account."[53] He provided BUS with a copy of his passport from the Commonwealth of Dominica

issued on March 12, 2019.[54] The record reflects that Mr. Ghader, however, never resided in the

Commonwealth of Dominica and had legally obtained the passport by making a payment to the

government of the Commonwealth of Dominica.[55]

On March 27, 2019, BUS reminded Mr. Ghader that it had disabled his Account

because it had concluded that Mr. Ghader resided in a sanctioned jurisdiction.[56] The same day,

Mr. Ghader contested BUS' decision to keep his Account suspended.[57] Mr. Ghader referred to

his Dominica passport and noted: "you should activate my account and I do not understand why

you did not enable it until now. As you know for each day you do not activate it, I lost the value

and profit of trading and [BUS] should be responsible for that."[58]

On March 28, 2019, Mr. Ghader sent to BUS a message similar to the one he had

written the day before, but additionally stated that he had previously provided BUS an address in

Dubai.[59] On April 3 and 4, 2019, Mr. Ghader followed up with BUS by sending emails similar to

his March 28, 2019 communication seeking to reactivate the Account.[60] Mr. Ghader then

provided BUS with a March 20–April 4, 2019 statement from a London-based entity associating

---

[51] *Id.*
[52] 1/16/24 Tr., 77:11-12 (Maria testimony).
[53] PA Ex. 18.
[54] 1/16/24 Tr., 83:4-10 (Maria testimony); PA Ex. 18.
[55] 1/18/24 Tr., 485:7-18 (Ghader testimony); PA Ex. 18.
[56] 1/16/24 Tr., 83:24–84:1 (Maria testimony); PA Ex. 18.
[57] PA Ex. 18.
[58] 1/16/24 Tr., 84:2-8 (Maria testimony); PA Ex. 18.
[59] PA Ex. 18.
[60] *Id.*

his name to an address in Luxembourg (the "Luxembourg Address").[61] However, the record at

trial revealed that he never resided in Luxembourg, and Mr. Ghader testified that the

Luxembourg Address was simply a "business address."[62]

On April 3 and 4, 2019, Mr. Ghader started a separate conversation with BUS.[63]

claiming that his Account had been disabled without reason.[64] BUS informed him again that his

Account was restricted due to U.S. sanctions laws, and, in response, Mr. Ghader asked BUS to

review the documents he had previously provided.[65] The documents he had provided consisted

of his Commonwealth of Dominica passport and office sharing locations in Dubai or

Luxembourg, where Mr. Ghader admits he never lived.[66]

On or around May 6, 2019, Mr. Ghader opened a second account with Malta

OpCo by (i) using a new email address; and (ii) providing his Dominica passport and the

Luxembourg Address.[67] In setting up this new account, Mr. Ghader again accepted the 2018

Terms of Service.[68] On May 8, 2019, he asked the Debtors to consolidate his new account with

---

[61] *Id.*

[62] 1/17/24 Tr., 312:8 (Ghader testimony); 1/18/24 Tr., 403:12-13, 411:13 (Ghader testimony). The Plan Administrator focused significant testimony as to Mr. Ghader's various addresses and usage of VPN or "virtual private network" to access BUS' website; *see, e.g.*, 1/16/24 Hearing Tr. 52:12-20, 67:8-16 (Maria testimony); PA Ex. 27. Mr. Ghader testified that he routinely uses a VPN because of restrictions by the Iranian government and also for security and privacy purposes. *See* 1/18/24 Hearing Tr. 462:6-463:19. He further testified that he did not use a VPN when accessing the Exchange as supported by his provision of his Iranian passport and Iranian phone number to BUS, as well as multiple logons by Mr. Ghader to the Exchange from an Iranian IP address. *See* 1/18/24 Hearing Tr. 463:10-13; *see also* PA Ex. 27. Given Mr. Ghader's admission that he was a resident of Iran during 2017 and 2018 before establishing residency in Turkey as of January 1, 2019 (1/17/24 Hearing Tr. 307:23-308:13 (Ghader testimony)), the Court finds the arguments and testimony related to Mr. Ghader's VPN usage and the corresponding IP logs to be largely irrelevant to the issues before this Court.

[63] PA Ex. 104.

[64] *Id.*

[65] *Id.*

[66] 1/17/24 Tr., 312:6-8 (Ghader testimony); 1/18/24 Tr., 403:12-13, 485:7-8 (Ghader testimony); PA Ex. 18, 104. In 2019, Mr. Ghader represented his residency to be in countries in which he never resided: (i) Dubai/United Arab Emirates; (ii) the Commonwealth of Dominica; and (iii) Luxembourg. At trial, Ghader testified that in 2019, although he was a Turkish resident, he: (i) spent some time in Luxembourg and Estonia; and (ii) traveled to Iran more than five times, without remembering the dates or the lengths of his various Iranian stays. 1/17/24 Tr., 308:18-20, 309:4-5 (Ghader testimony); 1/18/24 Tr., 403:2-3, 404:1-4 (Ghader testimony).

[67] 1/16/24 Tr., 87:23-25, 88:2-3 (Maria testimony); PA Ex. 19, 28, 103.

[68] 1/16/24 Tr., 87:18-19 (Maria testimony); PA Ex. 28.

the 2017 Account.[69] Mr. Ghader was informed on May 9, 2019 that his original Account would

remain suspended until BUS received further direction or authorization from OFAC.[70]

Importantly, the Plan Administrator testified at trial that no matter what

information or documentation Mr. Ghader would have been provided to BUS during the 2017-

2019 period—including proof that Mr. Ghader was no longer residing in Iran——BUS would

not have reactivated Mr. Ghader's Account or transferred Mr. Ghader's cryptocurrency back to

him.[71] Mr. Maria described BUS' thought process at that time as follows:

- ". . . At this time, because Bittrex had applied for the license almost a
  year before, any account that was implicated in that license process, they
  weren't going to release until they got guidance from OFAC. So, they
  had listed his account and all other accounts from these regions . . . and
  until they heard back from OFAC, they're not going to take a chance of
  violating another [regulation] by releasing it during that period of
  time."[72]

- "My understanding is that while the OFAC license application was
  pending and while the lawyers were talking with OFAC, any account
  that was tied up in that would not have been released other than with
  guidance from OFAC, the individual license or otherwise, until OFAC
  acted on that."[73]

- "I wouldn't say OFAC told us that. That's just smart practice that while
  you've acted and you have a license out there, why would you take a
  chance of violating sanctions knowingly, which is a criminal offense,
  while you have a license pending, and you're taking efforts to actually
  find a legitimate way to release these funds."[74]

### D. The OFAC License

---

[69] 1/17/24 Tr., 366:25–367:2, 367:22-25 (Ghader testimony); PA Ex. 19.

[70] *Id.*

[71] 1/16/24 Hearing Tr. 181:1-22; 182:3-16 (Maria testimony). The Plan Administrator conceded that this internal policy was not required by OFAC.

[72] 1/16/24 Hearing Tr. 84:22–85:5 (Maria testimony); Mr. Maria's response to being asked why BUS did not reactivate Mr. Ghader's Account at that time. *See* 1/16/24 Hearing Tr. 84:14-19 (Maria testimony).

[73] 1/16/24 Hearing Tr. 181:18-22 (Maria testimony). Mr. Maria's response to being asked: ". . . [Y]our testimony is, during this period in 2019 while [Mr. Ghader] lived in Istanbul, even if he would have shown his lease, his utility bill, none of it would have mattered because you all were pending this OFAC license, correct?" 1/16/24 Hearing Tr. 181:14-17 (Maria testimony).

[74] 1/16/24 Hearing Tr. 182:3-8 (Maria testimony). Mr. Maria's response to being asked: ". . . [C]an you provide us something where OFAC told you all that?" 1/16/24 Hearing Tr. 181:25–182:2 (Maria testimony).

On September 26, 2019, OFAC issued a license (the "License") to BUS

providing it a six-month window to release assets on the Exchange to customers residing in

Iran.[75] After receiving the License, BUS notified all affected customers in or related to Iran by

sending blast emails in November and December 2019 and January 2020.[76] BUS sent blast

emails to "all the email addresses of anyone whose accounts had been disabled."[77] In the blast

emails, BUS informed all customers with an Iranian nexus that it had obtained the License and

provided detailed instructions to withdraw assets before the License expired.[78] Mr. Ghader did

not respond to any of the blast emails, but the Plan Administrator testified that he could not say if

Mr. Ghader actually received these communications or not.[79] Prominent media outlets including

Cointelegraph and CoinDesk reported on the OFAC License in early November 2019, quoting

from the email that BUS sent to Iranian customers around that time.[80]

As of early February 2020, Mr. Ghader had failed to respond to any of the

mass emails that BUS sent to Iranian customers.[81] Because Mr. Ghader failed to respond to prior

emails and had a substantial balance in his Account, a BUS employee directly contacted Mr.

Ghader on February 3, 2020 to encourage him to withdraw his assets and transfer them to

another cryptocurrency exchange pursuant to the License.[82] BUS informed Mr. Ghader of the

---

[75] 1/16/24 Tr., 89:12-18 and 21 (Maria testimony); PA Ex. 47.

[76] 1/16/24 Tr., 91:13-20 and 22-24, 94:24–95:2 (Maria testimony).

[77] 1/16/24 Tr., 91:17-20 (Maria testimony).

[78] 1/16/24 Tr., 91:13-16 (Maria testimony).

[79] 1/16/24 Hearing Tr. 91:11-24 (Maria testimony) ("I can't say if he [Mr. Ghader] received it or not, . . . ."). Other than the Plan Administrator's representation that an email describing the OFAC License was sent by BUS to the email addresses associated with disabled accounts, no evidence of this email being sent directly to Mr. Ghader in 2019 was admitted.

[80] 1/16/24 Tr., 94:1-6 (Maria testimony).

[81] 1/16/24 Tr., 95:3-6 (Maria testimony).

[82] 1/16/24 Tr., 95:6-11, 20-23 (Maria testimony); PA Ex. 20. Mr. Ghader's position is that based on the evidence admitted at the trial, it was not until February 3, 2020, that BUS notified Mr. Ghader of the withdrawal requirements set forth in the OFAC License and his ability to access and transfer his Account assets as he never received any of the November  2019–January 2020 mass emails.

OFAC License and listed three requirements[83] for Mr. Ghader to receive his Account assets:

> (i)     Create an account at a permitted cryptocurrency exchange or hosted wallet;

> (ii)    Create an account at support.bittrex.com, using the email address he used to register his Bittrex account; and

> (iii)   Fill out the required forms designating the name of the exchange or hosted wallet to send his funds, and the address for each of the cryptocurrencies involved.

The instructions BUS provided to Mr. Ghader expressly stated that BUS could require additional identification from Mr. Ghader before releasing his assets on the Exchange.[84] In its correspondence, BUS set a March 15, 2020 deadline for Mr. Ghader to act—a date earlier than the OFAC deadline—to ensure there would be time to process his requests for withdrawal before the license would expire on March 31, 2020.[85]

Mr. Ghader did not respond to BUS' February 3, 2020 communication until March 11, 2020, when he wrote that BUS had disabled his Account without reason, and referred to his prior correspondence with BUS.[86] BUS replied on that same day with the generic response regarding the suspension of Mr. Ghader's Account due to OFAC sanctions.[87] Later that day, Mr. Ghader initiated a separate conversation with BUS seeking again to withdraw cryptocurrencies associated with his Account.[88] BUS responded by reiterating the withdrawal procedure, including the need to fill out a form that OFAC approved as part of the License process.[89]

Mr. Ghader responded by: (i) providing a partially completed OFAC withdrawal form

---

[83] PA Ex. 104.

[84] PA Ex. 20 ("Additionally, [Bittrex] may require additional identification procedures in order to release your funds.").

[85] PA Ex. 20; 1/16/24 Tr., 96:2-23 (Maria testimony).

[86] 1/16/24 Tr., 96:25–97:1, 97:12-13, 97:20-22 (Maria testimony); 416:23-25 (Ghader testimony); PA Ex. 21, 105.

[87] PA Ex. 105

[88] 1/16/24 Tr., 97:8-15 (Maria testimony); PA Ex. 21.

[89] 1/16/24 Tr., 97:24–98:3, 99:4-14 (Maria testimony); PA Ex. 21.

listing balances for some but not all of the cryptocurrencies he had on the exchange; and (b) promising that he would send a further withdrawal form.[90] On the withdrawal form, Mr. Ghader reported to BUS, for the first time, an address in Turkey.[91] Upon receiving the withdrawal form, a BUS employee asked him to provide a copy of his ID and a proof of residency dated within the previous 90 days.[92] Mr. Ghader provided (1) his official Turkish property tax bill in the Turkish language, which showed the address in Turkey; (2) a utility bill in Turkey in the Turkish language, which showed the same address and his full name; (3) the completed withdrawal form to transfer his digital currency to Binance, which was an eligible exchange under the OFAC License[93]; and (4) one picture of Mr. Ghader holding his Dominica passport.[94]

Mr. Ghader followed up with Bittrex on March 17 and 19, 2020.[95] On March 21, 2020, Bittrex asked Mr. Ghader to (i) list all of his cryptocurrency on the otherwise incomplete OFAC withdrawal form submitted in the March 11, 2023 correspondence; and (ii) provide three differently angled pictures of him holding a governmental ID and a piece of paper with the current date.[96] Bittrex required these three pictures as part of its standard procedure to verify Mr. Ghader's Account ownership and to prevent identify theft.[97] On March 27, 2020, Mr. Ghader

---

[90] 1/16/24 Tr., 98:6-17 (Maria testimony); PA Ex. 21.

[91] PA Ex. 21.

[92] PA Ex. 21. Specifically, BUS listed four types of proof of location: (i) "Utility bill"; (ii) "Property lease" (iii) "Title, rental agreement"; and (iv) "Property Tax filing." *Id.*

[93] 1/17/24 Hearing Tr. 195:14-16 (Maria testimony) (acknowledging that Binance was an eligible exchange in 2020).

[94] *See id.* Mr. Ghader did not introduce as evidence any English translation of the Turkish tax or utility documents, and therefore, it is unclear what those two documents demonstrate. *See* 1/17/25 Tr., 196:20–198:23; 199:23-24, 200:2-6, 203:25, 207:19-23 (Maria testimony). Further, one of those documents, which Mr. Ghader described as a "property tax records in Istanbul," 1/17/24 Tr., 198:6, does not appear to be a property tax record, because in February 2021, Mr. Ghader represented to Bittrex that the same document was a "Personal Tax Identification Letter." PA Ex. 22.

[95] PA Ex. 21

[96] PA Ex. 21; *see, e.g.,* Claim Objection, D.I. 411 at ⁋ 15 ("In March 2020, Mr. Ghader finally responded to Malta OpCo with a bare-bones form for withdrawal of his assets. However, as required by Malta OpCo's regulatory compliance policies, Malta OpCo asked Mr. Ghader to provide three (differently angled) pictures . . . .").

[97] 1/16/24 Tr., 100:11-21, 100:25–101:19, 101:24–102:10 (Maria testimony); PA Ex. 21. Mr. Maria's response to being asked why additional pictures are required along with a passport: ". . . [I]t's to verify the identity: one, to make sure the person is who they say they are under the know-your-customer regulations, but also to make

responded to Bittrex, stating that he would "send the requested documents [in the] next hours" and asking if the Exchange "need[ed] any other documents."[98] The same day, Bittrex let him know that it was waiting for the "form and the photos" to "continue processing [his] request."[99]

Unfortunately, Mr. Ghader failed to provide Bittrex with the promised documents, and the License expired on March 31, 2020.[100] Consequently, he was unable to remove his assets from the Exchange during the License period, and they were again frozen. Mr. Ghader did not contact Bittrex again for the remainder of 2020.[101]

On January 29, 2021, long after the OFAC License period expired, Mr. Ghader once again attempted to have his Account activated so he could obtain the return of his cryptocurrency. He reported that he was not a resident of a restricted jurisdiction and had requested that BUS either reactivate his Account or transfer the assets to Binance.[102] On February 4, 2021, a BUS employee asked for a proof of location, showing Mr. Ghader's physical address and full name, and noting that "[a]cceptable proof of location must show your physical address and full name and include: Utility bill (water, electricity, gas, sewer, trash, etc.)[;] Property lease or rental agreement[;] Mortgage bill[;] [or] Residential Property Tax filing[.]"[103]

On February 7, 2021, Mr. Ghader provided BUS with a copy of his Dominica passport, selfies, and the January 2020 Documents, which Mr. Ghader described as being a "Tax Certificate Number and approval letter" and a "Certificate for address."[104] On February 9, 2021,

---

sure we're not giving someone's money out to someone else who got into their account. So if they get in here and can somehow deceive the system by doing a fake ID or a picture that matches it and we give that money to the wrong person, that's also very problematic."

[98] PA Ex. 21.
[99] *Id.*
[100] 1/16/24 Tr., 103:8-11, 104:3-4 (Maria testimony); 1/18/24 Tr., 423:19–424:3 (Ghader testimony); PA Ex. 47.
[101] 1/16/24 Tr., 103:8-11 (Maria testimony).
[102] 1/16/24 Tr., 104:9-16 (Maria testimony); PA Ex. 22.
[103] *Id.*
[104] 1/16/24 Tr., 105:18-20 (Maria testimony); PA Ex. 22.

BUS asked him to clarify if one of the January 2020 Documents was a "residential tax document" or a "personal income tax statement."[105] The same day, Mr. Ghader asserted that the document he had sent to BUS was a "Personal Tax Identification Letter" issued by Turkish tax authorities based on his residential address.[106]

BUS deemed the January 2020 Documents insufficient because they failed to establish proof of residency in a non-sanctioned jurisdiction.[107] On February 19, 2021, Mr. Ghader was asked if he could provide any of the four acceptable "proof[s] of location" that BUS had mentioned in its earlier communication.[108] Mr. Ghader did not respond to BUS' request and had no further communication with the Debtors in 2021 and 2022.[109]

In a lengthy correspondence beginning from April 3, 2023 until June 30, 2023, Mr. Ghader again attempted to retrieve his cryptocurrency, to no avail.[110] In the spring of 2023, he finally established that he resided in Turkey[111] by providing BUS with a set of documents containing (i) a proof of residence issued by the Turkish government; (ii) a rental agreement related to real property in Turkey; (iii) a utility bill; and (iv) bank statements showing the residential address.[112]

As noted above, the Debtors filed their voluntary Chapter 11 petitions on May 8, 2023. On June 13, 2023, the Court entered an order authorizing customers to withdraw their deposits of cryptocurrencies and fiat currencies as a part of the Debtors' orderly wind down process (the

---

[105] 1/16/24 Tr., 105:22-25 (Maria testimony); PA Ex. 22.
[106] PA Ex. 22.
[107] 1/16/24 Tr., 106:11-14 (Maria testimony).
[108] 1/16/24 Tr., 106:16-25 (Maria testimony); PA Ex. 22.
[109] 1/16/24 Tr., 107:5-11 (Maria testimony).
[110] Ghader Ex. 58.
[111] In fact, before 2023, no IP data for Mr. Ghader's Account showed that he was located in Turkey when he logged in. PA Ex. 27.
[112] 1/16/24 Tr., 107:23–108:1 (Maria testimony); Ghader Ex. 6, ¶ 17.

"Customer Withdrawal Order").[113] Between July 5 and 6, 2023, pursuant to the Customer

Withdrawal Order, Mr. Ghader withdrew over 99% of the cryptocurrency assets associated with

his Account—an amount equal to approximately $273,000 as of May 8, 2023.[114] As of January

16, 2024, Mr. Ghader still had cryptocurrencies on the Exchange with an aggregate value of

approximately $4,000.[115]

### E. Mr. Ghader's Claims

Mr. Ghader timely filed 11 proofs of claims seeking recovery in excess of $80 million

collectively from various Debtor entities. On September 29, 2023, the Debtors objected to Mr.

Ghader's claims.[116] As noted above, the parties have entered into the Claims Stipulation[117] which

provides the following:

- Mr. Ghader's holds four Surviving Claims;

- to the extent one or more of the Surviving Claims shall be allowed, Mr. Ghader shall be entitled to only a single recovery;

- the total recovery of Mr. Ghader, if any, cannot exceed US $21,835,750;[118] and

- the Surviving Claims are general unsecured claims not entitled to any priority rights.

---

[113] D.I. 128.

[114] D.I. 128; 11/16/24 Tr., 107:15-19 (Maria testimony); Ghader's Ex. 6 ¶ 21.

[115] 1/16/24 Tr., 107:15-19 (Maria testimony). Specifically, the remaining cryptocurrency in his Account is: (i) 728,217.96089 HempCoin (THC); (ii) 13,782,397.10790 ReddCoin (RDD); (iii) 1,970.62728 Particl (PART); (iv) and 6,485.57100 TenX Pay Token (PAY). 1/17/24 Tr., 262:--8, 13, 264:22 (Hengel testimony); Ghader Ex. 6 ¶¶ 22, 26.

[116] Claim Objection, 2. The Claim Objection also sought the allowance of Claim 600-96 in the amount of $3,206.71 for voting purposes. However, given that voting on the Plan has concluded and the Plan is now effective, this aspect of the relief requested in the Claim Objection is moot.

[117] D.I. 468. Mr. Ghader's pleadings, along with the Claims Stipulation, define his unsecured claims, which are limited to the causes of action that Mr. Ghader listed in Claims 598-998 and 600-87 and repeated in the Response: (i) fraud; (ii) breach of contract; (iii) breach of fiduciary duty; (iv) conversion; (v) tort; (vi) civil conspiracy; (vii) emotional distress; (viii) personal injury; (ix) misrepresentation; (x) breach of the implied duty of good faith and fair dealing; (xi) unjust enrichment; and (xii) negligence and lost profits. In Claims 598-1021 and 600-96, Mr. Ghader did not mention any causes of action, and in his Response, he did not specify what causes of action he intended to pursue.

[118] Claim Stipulation, ¶¶ 3-7. The record reflects that, in connection with confirmation of the Plan, the Debtors have reserved the full $21 million for Mr. Ghader's claims in cash.

Mr. Ghader's claims against BUS and Malta OpCo (collectively, the "Class 3 Claims")[119] are identical apart from the Debtor against whom the claim is asserted. The Class 3 Claims assert a claim for 750 Bitcoins in the amount of $20,835,750 against each applicable Debtor for damages arising "under a number of legal theories, including, but not limited to, fraud, breach of contract, breach of fiduciary duty, conversion, tort, civil conspiracy, emotional distress, personal injury, misrepresentation, breach of the implied duty of good faith and fair dealing, unjust enrichment, negligence and lost profits."[120]

At trial, Mr. Ghader testified that he calculated his Class 3 Claims by determining the all-time-high price of each cryptocurrency held in his BUS Account during the time his Account was frozen.[121] He testified that he then converted the U.S. dollar value of his cryptocurrency into Bitcoin and calculated the value of the cryptocurrency in his Account to be worth at around 847 Bitcoin.[122] However, he testified that he rounded the amount of Bitcoin down from 847 to 750[123], and then multiplied 750 Bitcoin by the price of Bitcoin on the Petition Date[124] to arrive at the claim amount of $20,835,750.[125]

At trial, Mr. Ghader offered, and the Court accepted, the expert testimony of Adam Zarazinski which provided an alternative valuation of Mr. Ghader's cryptocurrency assets.[126] Mr. Zarazinski testified that the maximum value of the cryptocurrency in Mr. Ghader's Account

---

[119] *See* 1/16/24 Hearing Tr. 23:12–13 (P. Tomasco argument for Plan Administrator) ("Two of -- the two $20 million claims are classified as Class 3 under the plan noncustomer claim.").

[120] Addendum to Class 3 Claims, 3. Prior to the January 2024 trial on the Claim Objection, Mr. Ghader informed the Plan Administrator that he was no longer seeking damages on behalf of lost profits or other claims related to Mr. Ghader's attempts to create an Estonian cryptocurrency exchange. *See* 1/16/24 Hearing Tr. 31:12-18.

[121] 1/18/24 Hearing Tr. 520:22–524:19 (Ghader testimony).

[122] 1/18/24 Hearing Tr. 520:22–524:19 (Ghader testimony).

[123] Ghader Ex. 15; 1/18/24 Hearing Tr. 523:2-5 (Ghader testimony). Mr. Ghader also provided a spreadsheet of his calculations of his Class 3 Claims and clarified that he was not claiming that he had 750 bitcoin in his BUS Account, but, rather, that the cryptocurrency in his Account was worth at least 750 bitcoin.

[124] D.I. 92 at 14. The Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs confirms the price of Bitcoin on the Petition Date was $27,781.00.

[125] 1/18/24 Hearing Tr. 523:6–524:19 (Ghader testimony).

[126] *See generally* 1/29/24 Hearing Tr. (Zarazinski testimony). Mr. Zarazinski is an expert in the fields of

between October 11, 2017 and July 9, 2023 was $8,756,582, and the maximum value of

Ghader's cryptocurrency in Ghader's Account between April 1, 2020 and July 9, 2023 (the

period following expiry of the OFAC License) was $3,447,332.[127]

## PARTIES' POSITIONS

Debtors object to all of Mr. Ghader's Surviving Claims primarily on the ground that the

applicable Terms of Service, to which he agreed, preclude any liability or recovery for

incidental, consequential, or punitive damages and thus preclude damages from his inability to

access his assets on the Exchange while his Account was frozen. Debtors assert therefore that

Mr. Ghader cannot pursue tort claims for loss of value and profits resulting from the disabling of

his Account because they are precluded by both the 2015 and 2018 Terms of Service. Separately,

the Debtors contend that substantially all of the Surviving Claims are time-barred under

applicable statutes of limitation.

In response, Mr. Ghader contends that his Surviving Claims are based upon the

Debtors' wrongful acts, as evidenced by their refusal to honor his repeated withdrawal requests.

Mr. Ghader asserts that he has proven multiple state law claims of breach of contract,

conversion, breach of BUS' and Malta OpCo's implied duty of good faith and fair dealing, and

violations of Washington's Unfair Business Practices Act—all of which he contends are not

precluded by the applicable Terms of Service. He further asserts that his Surviving Claims fall

within Washington's Unfair Business Practices Act's four-year statute of limitations. Separately,

Mr. Ghader contends that his claim for breach of contract falls within Washington's six-year

---

cryptocurrency and cryptocurrency evaluation.
[127] *See id.* Mr. Zarazinski further testified regarding the extreme volatility in the cryptocurrency market and the declining impact on the total value of Mr. Ghader's Account between the two timeframes. 1/29/24 Hearing Tr. 26:4-25 (Zarazinski testimony); *see also* Ghader Ex. 37 at 3 (Zarazinski expert report) (setting forth an exact valuation of Mr. Ghader's Account assets beginning on October, 11 2017 as $8,756,582.50); 1/29/24 Hearing Tr. 28:16–29:5 (Zarazinski testimony); *see also* Ghader Ex. 37 at 4 (positing an exact valuation of Mr. Ghader's Account assets beginning on April 1, 2020 as $3,447,332.26).

statute of limitations, which would relate back to six years prior to the Petition Date or May 8, 2017—a point in time prior to his first accessing the Exchange.[128]

## **LEGAL STANDARD**

The Debtors object to the claims under 11 U.S.C. § 502(b)(1), which provides that a court will disallow a claim to the extent it is unenforceable under applicable law.[129] The burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times."[130] Initially, the claim holder must establish the *prima facie* validity of the claim.[131] Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure (i.e., includes the facts and documents necessary to support the claim), constitutes *prima facie* evidence of the validity and amount of the claim.[132] The claim objector must then produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[133] At that point, the burden shifts back to the claim holder to prove the validity of the claim by a preponderance of the evidence.[134] The ultimate burden of persuasion rests on the claim

---

[128] By letter ruling on January 26 (the "January 26 Letter Ruling"), the Court excluded Mr. Ghader's argument that any contractual arrangement with BUS violated federal law and therefore rendered void *ab initio*. Mr. Ghader never raised this argument before the conclusion of discovery and trial preparation. *See* D.I. 980. In the January 26 Letter Ruling, the Court further noted: "It is simply too late to raise new theories and arguments on the eve of trial, and accordingly the Court will not permit these new arguments to be made in post-trial submissions or otherwise in this dispute." *Id*. at 2.

[129] *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 245 n. 66 (3d Cir.2004).  ("To determine whether claims are enforceable for bankruptcy purposes, § 502 relies upon applicable non-bankruptcy law. . . . Ultimately, the effect of § 502 is to provide a bankruptcy trustee with the same rights and defenses to claims as held by the debtor prior to bankruptcy." (internal punctuation and citations omitted)).

[130] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

[131] *Id*. ("[T]he claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.").

[132] Fed. R. Bankr. P. 3001(f);  *In re Samson Res. Corp.*, 569 B.R. 605, 615 (Bankr. D. Del. 2017); "Because a properly filed proof of claim is treated not merely as a document containing arguments and assertions, but as evidence that sufficiently supports its claims, a proof of claim that is filed "in accordance" with Bankruptcy Rule 3001 serves to satisfy the claimant's initial burden of production." *In re F-Squared Inv. Mgmt., LLC,* 546 B.R. 538, 543 (Bankr. D. Del. 2016) (quoting *Allegheny,* 954 F.2d 167, 173-74 (internal citations omitted)). Courts in this district have found "that the proof of claim pleading standard is a 'relatively low threshold' that is less burdensome than the federal civil pleading standard." *In re F-Squared,* 546 B.R. at 544 (collecting cases).

[133] *Allegheny*, 954 F.2d at 173.

[134] *Id*. at 174.

holder.[135]

In this case, Mr. Ghader, as the claim holder, met his initial burden when he filed his proofs of claim.[136] The Plan Administrator has provided sufficient evidence to adequately rebut the *prima facie* validity of Mr. Ghader's Surviving Claims. Accordingly, the burden has shifted back to Mr. Ghader to prove up his Surviving Claims by a preponderance of the evidence.

## DISCUSSION

### I.    THE 2015 AND 2018 TERMS OF SERVICE

Mr. Ghader joined the Bittrex exchange in June 2017, and in doing so agreed to the 2015 Terms of Service.[137] When creating his BUS Account in 2017 through a hyperlink on the BUS website, Mr. Ghader was afforded the opportunity to review the 2015 Terms of Service before checking the box to accept those contractual terms of service.[138] Indeed, Mr. Ghader testified that he searched the 2015 Terms of Service for mentions of the terms "Iran" and "sanctions,"[139] neither of which appeared.

As an initial matter, the record reflects that both the 2015 and 2018 Terms of Service (i) bar liability for incidental, consequential, and punitive damages; and (ii) limit all liability to 12 months of commissions preceding the event giving rise to the claim.[140] Under the 2015 Terms of Service, BUS could suspend Mr. Ghader's Account for any reason, including Mr. Ghader's breach of the 2015 Terms of Service, without incurring liability to him.[141] For example, Section 16 of the 2015 Terms of Service states, in relevant part:

---

[135] *Samson Res.*, 569 B.R. at 615.

[136] Even though Mr. Ghader's proofs of claim were not actually signed, the Court will nonetheless deal with the proofs of claim on the merits.

[137] *See* D.I. 470; *see also* 1/16/24 Tr., 75:5-8 (Maria testimony); 1/18/24 Tr., 498:9-11 (Ghader testimony).

[138] PA Ex. 101; 1/16/24 Tr., 46:8-15, 47:15-23, 48:2-3, 69:16-22 (Maria testimony); 1/17/24 Tr., 341:16–342:3 (Ghader testimony).

[139] 1/17/24 Tr., 350:8-18.

[140] PA Ex. 40, 41.

[141] PA Ex. 40.

"In the event of any Force Majeure Event (as defined in Section 22.3), breach of these Terms, or any other event that would make provision of the Services commercially unreasonable for Bittrex, we may, in our discretion and without liability to you, with or without prior notice, suspend your access to all or a portion of our Services. We may terminate your access to the Services in our sole discretion, immediately and without prior notice, and delete or deactivate your Bittrex account and all related information and files in such account without liability to you, including, for instance, in the event that you breach any term of these Terms…. Further, we may, in our sole discretion and without liability to you, with or without prior notice and at any time, modify or discontinue, temporarily or permanently, any portion of our Services."[142]

Similarly, Section 4.1 of the 2015 Terms of Service provides that BUS "may, at any time and in [its] sole discretion, … impose any … conditions or restrictions upon your use of the Services, without prior notice."[143] The 2018 Terms of Service similarly authorized Bittrex to suspend Mr. Ghader's Account if necessary.[144] Section 10.2 of the 2018 Terms of Service states, in relevant part: "Bittrex may, at its discretion and without liability to you, with or without prior notice and at any time, temporarily suspend or permanently terminate your access to all or a portion of any Services."[145]

The record also reflects that Section 4 of the Terms of Service lists several risks— including potential devaluation of account assets, any kind of losses, inability to receive financial benefits available to other customers, and restrictions to the account—that may materialize because of cryptocurrencies becoming defunct/delisted or governmental actions (such the OFAC sanctions): "The risks described in this Section 4 may result in loss of Tokens, decrease in or loss of all value for Tokens, inability to access or transfer Tokens, inability to trade Tokens, inability

---

[142] *Id.*

[143] *Id.*

[144] PA Ex. 41. Section 10.3 of the 2018 Terms of Service provides: "Bittrex will not be liable for any losses suffered by you resulting from any modification of any Services or from any suspension or termination of your access to all or a portion of any Services (whether pursuant to this Section 10 or for any other reason). If and when Services resume, you acknowledge that Token valuations and exchange rates may differ significantly from the valuations and rates prior to such event." *Id.*

[145] *Id.*

to receive financial benefits available to other Token holders, and other financial losses to you."[146] The 2015 and 2018 Terms of Service each provide for the application of Washington law.[147]

The extensive record developed at trial also demonstrates that Mr. Ghader signed onto the Debtors' crypto platform in 2018, and in so doing "checked the box" agreeing to the 2018 Terms of Service.[148] "A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."[149]

Moreover, due to the "well-settled rule that a party is bound by what it states in its pleadings," Mr. Ghader is also bound by his judicial admissions that the 2015 Terms of Service apply to his relationship with Debtors.[150] In his Response, Mr. Ghader acknowledged that he had

---

[146] PA Ex. 40, 41. Specifically, section 4 of the Terms of Service state: "Bittrex may suspend or cease to support the transfer, storage or trading of any Token at any time at Bittrex's discretion. Other exchanges and service providers may do the same. . . . You may be unable to withdraw Tokens prior to Bittrex ceasing to support transfer of any such Tokens, resulting in the loss of any such Tokens remaining in your Bittrex Account. Any Token may decrease in value or lose all of its value due to various factors including discovery of wrongful conduct, market manipulation, changes to Token Properties or perceived value of Token Properties, Attacks, suspension or cessation of support for a Token by Bittrex or other exchanges or service providers, and other factors outside the control of Bittrex. Any Token may decrease in value or lose all of its value due to legislative or regulatory activity, or other government action. . . ."

[147] PA Ex. 40, 41. Section 21 of the 2015 Terms of Service provides, in relevant part, that: "The laws of the State of Washington, excluding its conflicts of law rules, govern your access to and use of the Services and Bittrex Materials." *Id.* Section 19 of the 2018 Terms of Service provides, in relevant part, that: "With respect to any Tokens that are made available for trading by Bittrex Inc., the interpretation and enforcement of these Terms, and any dispute related to these Terms or the Services, will be governed by and construed and enforced in accordance with the laws of the State of Washington, without regard to conflict of law rules or principles (whether of Washington or any other jurisdiction) that would cause the application of the laws of any other jurisdiction." *Id.*

[148] PA Ex. 27, 28; 1/16/24 Tr., 78:25–79:13 (Maria testimony).

[149] *Meyer v. Uber Techs, Inc.*, 868 F.3d 66, 79–80 (2d Cir. 2017); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014) (holding that assent can be provided by "using the website"). At its core, the issue is whether there is some conduct manifesting assent to the terms, from the perspective of a reasonable person; *see*, *e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) (stating that, under Washington law, "an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent").

[150] *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) ("Judicial admissions are concessions in pleadings or briefs that bind the party who makes them."); *Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (finding that the plaintiff was bound because she "expressly conceded those facts in her complaint."); *API Enterprises, Inc. v. Am. Standard, Inc.*, 2008 WL 1816399, at *1 (W.D. Okla. Apr. 22, 2008) ("Pleadings are judicial admissions, and a party may use them to render facts indisputable.").

agreed to the 2015 Terms of Service, and that these terms apply to his claims here:

- "At the time that he opened the Enhanced Account, Mr. Ghader agreed to Bittrex Inc.'s 2015 version of its Terms and Services attached hereto as Exhibit B.";[151]

- "The Debtors erroneously suggest in the Objection that Mr. Ghader's Enhanced Account and Wallet are governed by the Debtors 2018 Terms of Service (Exhibit C). However, as discussed more fully below, the Terms of Service could not, and did not, apply to Mr. Ghader's Enhanced Account.";[152]

- "[T]he only Terms of Service that apply to Mr. Ghader's Enhanced Account and Wallet are the 2015 TOS.";[153]

- "The Debtors seek to impose the 2018 TOS on Mr. Ghader in an attempt to impute the various limitations and restrictions noted in the 2018 TOS onto Mr. Ghader. The limitations and restrictions noted in the 2018 TOS do not exist in the 2015 Terms of Service (the '2015 TOS') applicable to Mr. Ghader's Enhanced Account and Wallet.";[154]

- "[BUS] was not entitled to block Mr. Ghader's account in light of the OFAC Sanctions. The 2018 TOS did not apply to Mr. Ghader. Rather, the 2015 TOS applied.";[155] and

- "The 2015 TOS applied to Mr. Ghader, not the 2018 TOS. Mr. Ghader did not irrevocably waive, release and discharge any and all claims, whether known or unknown, against the Debtors."[156]

Mr. Ghader's defunct/delisted crypto falls in the risk categories listed in section 4 of both the 2015 and 2018 Terms of Service, as well the (i) the "rewards" that Mr. Ghader asserts that he was entitled to receive; (ii) any loss Mr. Ghader allegedly suffered because his Account was frozen; and (iii) any financial benefits Mr. Ghader allegedly did not enjoy because of the blockage.[157]

---

[151] D.I. 470 ¶ 11.
[152] D.I. 470 ¶ 11 n.3
[153] D.I. 470 ¶ 88.
[154] D.I. 470 ¶ 88 n.5
[155] D.I. 470 ¶ 97.
[156] D.I. 470 ¶ 99.
[157] PA Ex. 40, 41.

Mr. Ghader claims that he did not understand the 2015 Terms of Service, and that the 2015 Terms of Service included inadequate language regarding "restricted locations." He contends that while the 2018 Terms of Service included expanded language regarding "restricted locations" to include explicit reference to sanctioned jurisdictions and OFAC, he states that he never accepted the 2018 Terms of Service. In sum, he argues that (1) the 2015 Terms of Service were on behalf of only BUS and, therefore, are unenforceable with respect to the Surviving Claims against Malta OpCo and (2) the 2015 Terms of Service's limitation of liability provisions are unenforceable under Washington law because they are inconspicuous and, alternatively, violate public policy. To the extent the 2018 Terms of Service apply to him, he asserts that those limitation of liability provisions are similarly unenforceable under Washington law.

The record indicates that Mr. Ghader did indeed agree to the 2015 and 2018 Terms of Service, otherwise he could not have used the Exchange. The testimony at trial revealed that Mr. Ghader is a sophisticated and capable businessman. The 2015 and 2018 Terms of Service are abundantly clear, and indeed his testimony showed he read and understood at least the 2015 Terms of Service. The disclaimers of damages and limitations on liabilities in the 2015 and 2018 Terms of Service are enforceable under Washington law.

Accordingly, the Court concludes that Mr. Ghader is bound by both the 2015 and 2018 Terms of Service via his voluntary elections and judicial admissions, and is thereby precluded from claiming incidental, consequential, and punitive damages. Mr. Ghader's claims for lost profits and various other categories of damages violate both the 2015 and 2018 Terms of Service, which disclaim damages and otherwise effectively limit the Debtor's liability.[158]

---

[158] The Plan Administrator also correctly notes that the exculpatory provisions contained in the Terms of Service are also enforceable against Mr. Ghader: he agreed to those broad exculpation provisions when signed onto

Therefore, Mr. Ghader's claims for damages are disallowed, and his claims are properly limited to the cryptocurrencies currently associated with his Account.

## II.    TORT CLAIMS ARISING BEFORE MAY 8, 2020

Mr. Ghader's Surviving Claims list non-contract based claims for negligence or negligent misrepresentation, conversion, fraud, breach of fiduciary duty, unjust enrichment, personal injury and negligent or intentional emotional distress, breach of implied covenant of good faith and fair dealing, and civil conspiracy.[159] These claims arise from Mr. Ghader's contention that BUS was not justified in disabling Mr. Ghader's Account and that it should have permitted him to withdraw cryptocurrencies at his request. Even if these tort claims could exist in the face of a binding contract, which they cannot in light of the applicable Terms of Service, the applicable statutes of limitations bar their assertion now.

Washington law applies to Mr. Ghader's tort claims under the choice of law provisions in the 2015 and 2018 Terms of Service. Even without these contractual choice-of law provisions, Washington law still applies pursuant to ordinary conflict of laws principles because Debtor's principal place of business was in Washington at all relevant times,[160] and no other evidence or pleadings suggest the application of the laws of a different jurisdiction.

As set forth below, Washington law sets the statute of limitations for Mr. Ghader's tort claims at three years, and his claims accrued long before May 8, 2020 (three years before the

---

the Exchange. *Shields v. Sta-Fit, Inc.*, 79 Wash. App. 584, 588–90 (Wash. Ct. App. 1995) (holding that exculpatory provision was not against public policy because the services provided by the defendant (a health club) were not an "indispensable necessity" and "essential to the welfare of the state or its citizens," plaintiff could have recurred to competitive alternatives, and plaintiff voluntarily submitted himself to the control of defendant despite having the option "not to join in the first place.").

[159] *See* Claims 598-998 and 600-87; D.I. 470 ¶¶ 66, 102.

[160] *See, e.g., In re Am. Metrocomm Corp.*, 274 B.R. 641, 659–60 (Bankr. D. Del. 2002) (citing the Restatement (Second) Conflict of Laws, stating that "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation," and holding that the parties' most significant contacts were in Louisiana, where the debtor had its principal place of business, or where the parties performed the contract).

Petition Date). Therefore, any tort claims arising before May 8, 2020 are time-barred.

Claims of negligence[161] or negligent misrepresentation, conversion,[162] fraud,[163] breach of fiduciary duty,[164] unjust enrichment,[165] personal injury and negligent or intentional emotional distress,[166] and civil conspiracy[167] expire after a three-year limitation period.

The statute of limitations for breach of implied covenant of good faith and fair dealing is six years if "the implied duty arises out of a written agreement."[168] To the extent Mr. Ghader's claims of breach of implied covenant of good faith and fair dealing is based on his contractual relationship, Mr. Ghader disclaimed consequential or special damages under the

---

[161] RCW § 4.16.080(2). The limitations period begins to run when the plaintiff has the right to seek relief in court. *See* RCW § 4.16.080(4); *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 739 (Wash. Ct. App. 2000). When there is a delay between the injury and plaintiff's discovery of it, the court may apply the discovery rule. Under the discovery rule, a cause of action accrues when a plaintiff discovers, or through reasonable diligence should have discovered, the facts giving rise to the cause of action. *1000 Va. Ltd. P'ship v. Vertecs Corp.*, 146 P.3d 423, 428 (Wash. 2006); *Green v. A.P.C.*, 136 Wash.2d 87, 95 (Wash. 1998).

[162] Claims for conversion must be brought within three years after the cause of action accrues. RCW § 4.16.080(2)(4); *Crisman v. Crisman*, 931 P.2d 163, 165 (Wash. Ct. App. 1997). The limitations period starts to run when the defendant holds the property openly and notoriously, so that the owner has reasonable opportunity of knowing its status and of asserting his title. *Krussow v. Stixrud*, 205 P.2d 637, 639 (Wash. 1949). Generally, the limitations period begins to run when the plaintiff suffers the injury. *See id.* Mr. Ghader raised this claim for the first time at the pretrial conference. 1/12/24 Tr., 14:23–15:2. In any event, Bittrex, LLC converted into BUS in 2016. 1/16/24 Tr., 70:5–8 (Maria testimony). Conversion of the corporate form does not impact the entity's contracts. *ARCPE Bahamas LLC v. Neuman*, 2020 WL 6870904, at *4-5 (S.D. Fla. Oct. 16, 2020) (discussing the conversion of an entity from a LLC to a corporation and stating: "The Court finds that there is no break in the Note's chain of title because CapitalSource International, LLC is deemed to be the same entity as CapitalSource International, Inc. as a matter of law."); *In re Sygenta AG Mir 162 Corn Litig.*, 2016 WL 5481997, at *2 (D. Kan. Sep. 29, 2016) ("Under Delaware law, if a corporation is converted into an LLC, the corporation's liabilities remain as liabilities of the LLC."). Conversion, in addition to being time-barred and barred by the applicable Terms of Service, cannot apply to these facts as Bittrex and Mr. Ghader are in a debtor-creditor relationship precluding damages based on conversion. *In re GPR Holdings, L.L.C.*, 318 B.R. 384, 390 (Bankr. N.D. Tex. 2004) ("Thus, in a debtor-creditor relationship, the remedy is a money judgment for the debt, not conversion.").

[163] RCW §§ 21.20.430(4)(b), 4.16.080(4); *Young v. Savidge*, 230 P.3d 222, 230 (Wash. Ct. App. 2010); *Ives v. Ramsden*, 174 P.3d 1231, 1239 (Wash. Ct. App. 2008). The limitations period starts to run when the aggrieved party discovers, or through reasonable diligence should have discovered, facts constituting the fraud. RCW § 4.16.080(4); *Ives*, 174 P.3d at 1239.

[164] RCW § 4.16.080(2); *Mayer v. Huesner*, 107 P.3d 152, 156 (Wash. Ct. App. 2005). The limitations period generally starts to run when a party has the right to seek relief in court. *Mayer*, 107 P.3d at 156.

[165] *Davenport v. Wash. Educ. Ass'n*, 197 P.3d 686, 704 (Wash. Ct. App. 2008). The limitations period starts to run when a party has the right to seek relief in court. *Eckert v. Skagit Corp.*, 583 P.2d 1239, 1241 (Wash. Ct. App. 1978).

[166] RCW § 4.16.080(2); *St. Michelle v. Robinson*, 759 P.2d 467, 470 (Wash. Ct. App. 1988). The statute of limitations starts to run at the time the act or omission occurs. *Gevaart v. Metco Const., Inc.*, 111 Wash.2d 499, 501 (Wash. 1988).

[167] RCW § 4.16.080(2); *City of Seattle v. Blume*, 947 P.2d 223, 226 (Wash. 1997).

[168] RCW § 4.16.040; *Khalid v. Microsoft Corp.*, 14 Wash. App. 2d 1055 (Wash. Ct. App. 2020).

accepted terms of service. The six-year statute of limitations period is therefore inapplicable. To the extent Mr. Ghader relies on some other extra-contractual claim, the applicable statute of limitations is three years.[169]

Mr. Ghader asserts that BUS wrongfully suspended his Account in October 2017, and that he lost profits from potential trading after that date. As noted above, the evidence shows that in October 2017, at the latest, Mr. Ghader knew that BUS disabled his Account because of the OFAC sanctions. Because BUS disabled Mr. Ghader's Account in October 2017, and Mr. Ghader knew his Account had been disabled at that time, the latest he could have brought the above-mentioned tort claims was October 2020 (three years after discovery of the cause of action). He did not do so. Therefore, any claims based on these non-contract causes of action are rejected as time barred.[170]

### III.    TORT CLAIMS ARISING AFTER MAY 8, 2020

Post-May 8, 2020, Mr. Ghader only contacted BUS or attempted to withdraw cryptocurrencies in January and February 2021, and then in spring of 2023. Specifically, on January 29, 2021, he contacted BUS, noting that he was not a resident of a restricted jurisdiction, and asking BUS to reactivate his Account or transfer the assets to Binance, an eligible

---

[169] RCW § 4.16.080(3); *Khalid v. Microsoft Corp.*, 14 Wash. App. 2d 1055.

[170] In addition, Mr. Ghader's unpled claim for an alleged unfair or deceptive act or practice under Washington's Consumer Protection Act ("CPA"), is barred by Washington law. Washington law sets the statute of limitations for a violation of the CPA at four years. RCW 19.86.120. In general, "[a] CPA cause of action accrues and the statute of limitations begins to run when a party has the right to apply to a court for relief." *Segar v. Allstate Fire & Cas. Ins. Co.*, 2022 WL 102035, at *7 (W.D. Wash. Jan. 11, 2022) (citation and internal marks omitted). "The discovery rule can also apply to CPA claims." *Shepard v. Holmes*, 185 Wash. App. 730, 740, 345 P.3d 786, 790 (Wash. Ct. App. 2014); *see Mason v. Washington State*, 2017 WL 2559621, at *8 (W.D. Wash. June 13, 2017) ("A cause of action under the CPA accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action."). In view of the foregoing, any alleged CPA claim would accrue before May 8, 2019 (four years before the Petition Date) because, before that date, (i) Mr. Ghader knew that Bittrex had allowed him and other Iranian customers to join the platform in violation of OFAC regulations (1/17/24 Tr., 316:17-19, 319:4-6; 1/18/24 Tr., 394:18-20; PA Ex. 16); and, according to Mr. Ghader's representations to Bittrex, (ii) he had suffered losses, which would have been avoided if Bittrex had not onboarded him as a customer.

cryptocurrency exchange under the OFAC License.[171] BUS asked for proof of Mr. Ghader's residency in the form of a "[u]tility bill (water, electricity, gas, sewer, trash, etc.)," "[p]roperty lease or rental agreement," "[m]ortgage bill," and "[r]esidential Property Tax filing."[172] Mr. Ghader did not provide any of these documents. Instead, he provided a copy of his Commonwealth of Dominica passport, selfies, and a "Tax Certificate Number and approval letter" and a "Certificate for address" from January 2020.[173] On BUS' request, Mr. Ghader clarified that the tax document was a "Personal Tax Identification Letter" rather than a property tax document.[174] BUS then again asked for proof of location consistent with the above, and Mr. Ghader failed to respond.

Mr. Ghader next contacted BUS in the spring and summer of 2023. At that time, he provided a rental agreement related to a property in Turkey and a utility bill.[175] He then withdrew nearly all of the cryptocurrencies associated his Account.[176] These facts demonstrate that the reason Mr. Ghader was unable to withdraw the assets associated with his Account was because he failed to provide sufficient proof of residency outside of Iran. Moreover, he presented no evidence of damages for the post-May 8, 2020 period. Therefore, Mr. Ghader failed to meet his burden of proof with respect to any claims for damages arising after May 8, 2020, even if they could have survived the Terms of Service prohibitions.

Further, Mr. Ghader's tort claims also fail under Washington's independent duty doctrine. The independent duty doctrine, like the economic loss rule, prohibits a party to a contract from bringing tort claims against another party to the contract unless the former can

---

[171] 1/16/24 Tr., 104:9-16 (Maria testimony); PA Ex. 22.
[172] PA Ex. 22.
[173] 1/16/24 Tr., 105:18-20 (Maria testimony); PA Ex. 22.
[174] PA Ex. 22.
[175] 1/16/24 Tr., 107:23–108:1 (Maria testimony); Ghader Ex. 6 ¶ 17.
[176] 1/16/24 Tr., 107:15-19 (Maria testimony); Ghader's Ex. 6 ¶ 21.

prove the latter breached a tort duty arising independently of the terms of the contract.[177] To the extent that duties are assumed by parties in a contract, a contracting party cannot raise tort claims based on that same duty.[178]

The Terms of Service entirely govern the parties' relationship, disclaim damages and permit account suspension. For example, as noted above, Section 4.1 of the 2015 Terms of Service specifies that BUS may "at any time and in our sole discretion, refuse any exchange transaction or exchange bid," or "impose any other conditions or restrictions upon your use of the Services, without prior notice."[179] Section 16 permits BUS, in its discretion and without liability for any "event that would make provision of the Services commercially unreasonable," to suspend access.[180] It further permits BUS, in its sole discretion, to immediately, and without prior notice, terminate access, delete or terminate the account, or modify its services.[181] Section 3.3 of the 2018 Terms of Service provides that BUS may require identity verification and screening procedures.[182] Section 8.1 permits BUS to suspend its services at any time and in its sole discretion.[183] Section 10.2 also permits BUS to suspend or terminate its services at its discretion, without notice, and without liability.[184]

Here, Mr. Ghader's claims, to the extent they arise after May 8, 2020, required proof that BUS wrongfully refused to permit Mr. Ghader to withdraw cryptocurrencies. However, Mr. Ghader failed to plead or prove any duty independent of the 2015 and 2018 Terms of Service and

---

[177] *Olympic Tug & Barge, Inc. v. Lovel Briere LLC*, 2023 WL 2864570, at *7 (W.D. Wash. Apr. 10, 2023) (dismissing conversion claim based on independent duty doctrine).
[178] *Mansur Props. LLC v. First Am. Title Ins. Co.*, 635 F. Supp. 3d 1116, 1126–27 (W.D. Wash. 2022) (dismissing negligence claim based on independent duty doctrine).
[179] PA Ex. 40.
[180] *Id.*
[181] *Id.*
[182] PA Ex. 41.
[183] *Id.*
[184] *Id.*

he failed to prove that BUS's conduct requiring proof of residency outside Iran was wrongful. Therefore, Mr. Ghader's claims, to the extent that they are predicated on BUS' refusal to permit Mr. Ghader to withdraw cryptocurrencies after May 8, 2020, are disallowed.[185]

## CONCLUSION

For the reasons stated above, the Claim Objection is **SUSTAINED**, the Surviving Claim that is Claim 600-96 is **ALLOWED** in the amount of 728,217.96089 HempCoin (THC), 13,782,397.10790 ReddCoin (RDD), 1,970.62728 Particl (PART), and 6,485.57100 TenX Pay Token (PAY) against Bittrex Malta Ltd., and the remainder of the Surviving Claims is otherwise **DISALLOWED**. The parties are directed to confer and submit a form of order consistent with this ruling within 10 days of the date hereof.

FOR THE COURT:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: May 22, 2024
        Wilmington, Delaware

---

[185] As noted above, Mr. Ghader presented the expert testimony of Adam Zarazinski, who opined that the peak value of the cryptocurrency holdings associated with Mr. Ghader's Account was approximately $8.75 million between October 11, 2017, and July 9, 2023, and $3.45 million between April 1, 2020, and July 9, 2023. However, due to the Court's determination that the applicable Terms of Service preclude damages, Mr. Ghader's tort claims before May 8, 2020 are time-barred, and that Mr. Ghader failed to allege or prove any tort claims accruing after May 8, 2020, the Court does not reach the calculation of Mr. Ghader's alleged damages.